Argued and submitted September 20, 2005, judgment against Oregon Taxpayers United PAC on Count 3 reversed; paragraphs 6 and 9 of judgment reversed; paragraph 13 reversed as to Oregon Taxpayers United PAC; paragraph 7 vacated as to Oregon Taxpayers United PAC and remanded; otherwise affirmed October 4, plaintiffs-respondents' joint petition for reconsideration filed October 17 and defendants-appellants' response to plaintiffs-respondents' petition for reconsideration filed October 24 allowed by opinion December 6, 2006

See 209 Or App 518, 149 P3d 159 (2006)

## AMERICAN FEDERATION OF TEACHERS-OREGON, AFT, AFL-CIO,

an Oregon unincorporated association,
*Respondent,*

*and*

## STATE OF OREGON,

*Intervenor - Respondent,*

*v.*

## OREGON TAXPAYERS UNITED PAC,

an Oregon political committee;
Oregon Taxpayers United Education Foundation,
an Oregon nonprofit corporation,
*Appellants,*

*and*

John DOES 1 through 10,
*Defendants.*

0108-08942; A122158 (Control)

## OREGON EDUCATION ASSOCIATION,

an Oregon nonprofit corporation,
*Respondent,*

*and*

## STATE OF OREGON,

*Intervenor - Respondent,*

*v.*

## OREGON TAXPAYERS UNITED PAC,

an Oregon political committee;
Oregon Taxpayers United Education Foundation,
an Oregon nonprofit corporation,
*Appellants,*

*and*

John DOES 2 through 10,
*Defendants.*

0012-12632; A122168
(Cases Consolidated)

145 P3d 1111

Gregory Byrne argued the cause for appellants. With him on the opening brief was Barry Adamson. On the reply brief was Gregory Byrne.

Gregory A. Hartman and Gene Mechanic argued the cause for respondents. With them on the joint brief were Michael J. Morris, Bennett, Hartman, Morris & Kaplan, LLP, and Mark S. Toledo, General Counsel for Oregon Education Association, and Robert Hamilton and Goldberg Mechanic Stuart & Gibson LLP.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for intervenor - respondent State of Oregon. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge,* and Edmonds, Judge.

* Brewer, C. J., *vice* Wollheim, J.

HASELTON, P. J.

Edmonds, J., concurring in part, dissenting in part.

**HASELTON, P. J.**

Defendants Oregon Taxpayers United Political Action Committee (OTU-PAC) and Oregon Taxpayers United Education Foundation (OTU-EF) appeal a judgment in favor of plaintiffs, Oregon Education Association (OEA) and American Federation of Teachers (AFT), and intervenor State of Oregon in this action pursuant to the Oregon Racketeer Influenced and Corrupt Organizations Act (ORICO), ORS 166.715 to 166.735. Defendants raise numerous assignments of error pertaining to the availability of unsworn falsification, ORS 162.085(1), as a predicate for ORICO purposes, the sufficiency of plaintiffs' pleadings and proof of causation, and the scope of the trial court's injunction. As explained below, we conclude that the trial court erred in entering judgment against OTU-PAC on the third count ("unsworn falsification") of plaintiffs' complaints and, consequently, in enjoining OTU-PAC based on liability on that count. We reject defendants' other contentions. Accordingly, we affirm in part, reverse in part, and, with respect to one provision of the injunction, vacate and remand for reconsideration.

The circumstances of this case are unprecedented. As described more fully below, plaintiffs and the state, as intervenor, sought and obtained a judgment under ORICO based on defendants' allegedly unlawful activities in connection with two 2000 initiative measures, Measures 92 and 98. Those measures would have severely restricted, or prohibited, the ability of school districts and other employers to implement "check-offs" for payroll deductions for union dues when some part of those dues were used for political purposes. Although the voters ultimately rejected both proposed measures in November 2000, plaintiffs contended that they had been injured by defendants' activities in that those activities were calculated to, and did in fact, cause plaintiffs to expend substantial resources in opposition to the proposed measures.

Plaintiffs are labor organizations who represent, *inter alia*, public school teachers and classified employees, as well as community college instructors and other employees. Defendant OTU-PAC is an unincorporated association acting

as a political committee organized under ORS 260.042. Defendant OTU-EF was, at all material times, an Oregon nonprofit public benefit corporation that purported to operate as a tax-exempt charitable or educational organization for purposes of Internal Revenue Code section 501(c)(3).

In December 2000, plaintiffs initiated this action against defendants for recovery of damages flowing from defendants' alleged racketeering activities, as well as for equitable relief. *See* ORS 166.725 (persons harmed by unlawful racketeering may obtain treble damages and various other forms of relief). Plaintiffs' complaints alleged three counts of racketeering activity. In the first count, plaintiffs alleged that Kelli Highley, while working as an employee and agent of both defendants, had forged signatures on statements of sponsorship for Measures 92 and 98,[1] in violation of ORS 165.007(1)(a).[2] Plaintiffs further alleged that, as a result of those forgeries, the Secretary of State approved for circulation initiative petitions for those measures. Thereafter, defendants gathered sufficient signatures on those petitions to place Measures 92 and 98 on the November 2000 general election ballot, compelling plaintiffs to expend substantial funds to oppose those measures.

In the second count, plaintiffs alleged that paid signature gatherers, acting as agents for defendants, had forged signatures on the initiative petitions for Measures 92 and 98 and falsely certified the petition sheets, again violating criminal forgery statutes. *See* ORS 165.007; ORS 165.013. Plaintiffs further alleged that, but for the "false, fraudulent or forged" signatures, neither measure would have qualified for the ballot.

In the third count, plaintiffs alleged that, through their agents Sizemore and Miller, OTU-EF had knowingly submitted false "CT-12" forms,[3] and OTU-PAC had knowingly submitted false contribution and expenditure (C&E)

---

[1] *See generally* ORS 250.045 (prospective initiative petitions must be accompanied by a "statement of sponsorship" signed by at least 25 electors).

[2] ORS 165.007(1) provides, in part:

"A person commits the crime of forgery in the second degree if, with intent to injure or defraud, the person:

"(a) Falsely makes, completes or alters a written instrument[.]"

[3] ORS 128.670 requires charitable organizations to file periodic reports concerning assets and expenditures with the Attorney General. The Attorney General

reports, to state authorities. Plaintiffs further alleged that those false submissions violated ORS 162.085(1)[4] and were calculated to facilitate and conceal the illicit funneling of funds raised by the tax-exempt OTU-EF to support OTU-PAC's efforts in promoting Measures 92 and 98. In particular, plaintiffs alleged that the CT-12 forms filed for OTU-EF "contain false statements about the use of OTU-EF funds"; that the false C&E reports filed for OTU-PAC "includ[ed] misstatements on the amount of funds received from OTU-EF and other contributors for use by OTU-PAC"; and that those false submissions, in combination, "conceal[ed] the source of contributions to Measure 92 and 98 and enabl[ed] more funds to be raised to support Measures 92 and 98 through the tax exempt OTU-EF."

The jury, by special verdict, found, as alleged in Count 1, that both defendants had engaged in a pattern of racketeering activity in connection with the forged sponsorship signatures for Measures 92 and 98, and further found that plaintiffs had been damaged by defendants' conduct. As to the second count, the jury found that both defendants had engaged in a pattern of racketeering activity in regard to signature-gathering on initiative petition 98, as well, but concluded that plaintiffs had not been damaged by that conduct. On Count 3, the jury found that defendants had engaged in a pattern of racketeering activity in regard to the filing of CT-12 and C&E reports and that plaintiffs had been damaged by defendants' conduct.

The jury awarded plaintiff OEA damages of $65,112 on Count 1 and $671,658 on Count 3, and awarded plaintiff AFT damages of $40,500 on Count 1 and $170,000 on Count 3.[5] The subsequent judgment, based on the jury's special findings, awarded OEA damages of $2,014,974 ($671,658

---

requires those reports to be made on "CT-12" forms. *See generally* OAR 137-010-0015.

[4] ORS 162.085(1) provides:

"A person commits the crime of unsworn falsification if the person knowingly makes any false written statement to a public servant in connection with an application for any benefit."

[5] The record does not disclose why the jury awarded substantially different damages on the two counts. No party suggests that the jury's verdict was somehow inconsistent in that regard.

trebled pursuant to ORS 166.725(7)(a)) and AFT damages of $510,000 ($170,000 trebled).

After the jury returned its verdict, the state intervened and, along with plaintiffs, sought injunctive relief. ORS 166.725(10). The trial court made extensive findings of fact in accordance with ORCP 62 and granted injunctive relief. In addition to finding essentially the same facts as the jury had with respect to defendants' racketeering activities, the court specifically found that, because of Highley's forgeries, Measures 92 and 98 ultimately were approved by the Secretary of State and placed on the 2000 general election ballot. The court further found that, if passed, those measures would have caused serious consequences to plaintiffs and that plaintiffs reasonably and necessarily expended funds to defeat those measures.[6]

As to Count 2, the court found that defendants' agents had submitted forged signatures on petitions and certification sheets for Measures 92 and 98, that those actions constituted racketeering activity, and that, as a result of those racketeering activities, Measures 92 and 98 had qualified for the 2000 general election ballot. That is, the court found that without the forgeries, neither measure would have qualified for the ballot.

Regarding Count 3, the court found that OTU-PAC was required under Oregon law to file periodic C&E reports and that OTU-PAC's agents had signed and filed false C&E reports from 1996 through 2000 by failing to disclose on those reports various cash and in-kind contributions that OTU-PAC had received from OTU-EF. The court determined that the result of those activities "was to cause tax deductible contributions which were made to OTU-EF, a charity, to be used illegally to fund OTU-PAC and to be paid to Bill Sizemore personally." The court further found that Bill Sizemore had developed schemes by which contributors could secretly provide financial support to OTU-PAC by funneling those contributions through other organizations and that those were

_____

[6] Plaintiffs presented evidence that, in fact, Sizemore's and Miller's specific intent in promoting these and other initiatives through their activities with OTU-PAC and OTU-EF was to cause plaintiffs to have to expend funds to try to defeat them.

in-kind contributions for the benefit of OTU-PAC that should have been reported on its C&E reports.

Regarding OTU-EF, the court found that defendant was required to submit annual reports (CT-12 reports) to the state in order to maintain its tax-exempt status; that Sizemore as agent for OTU-EF had falsely certified on each CT-12 from the years 1996 through 2000 that OTU-EF had not "attempted to influence national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum"; and that OTU-EF had not reported on its CT-12 any of its cash and in-kind contributions to political activities from 1996 through 2000 although those contributions were very substantial.[7] The court further found that OTU-EF's "involvement in educational activities was minimal"; that OTU-EF's minutes reflected its extensive involvement in the activities of OTU-PAC; and that OTU-EF had improperly concealed its political activities from the Internal Revenue Service in documents that were attached and incorporated into each CT-12 submitted to the state.

The court also found that OTU-EF's board of directors failed to provide ongoing oversight; that, after the jury verdict in the present case, a new entity called OTU2-PAC had been created in anticipation of the judgment in the present case; that no remedial action had been taken to protect OTU-EF resources from being used by OTU-PAC or OTU2-PAC; that OTU-PAC had submitted yet another false C&E report to the state after the jury verdict; and that a website for OTU2-PAC was promoting "tax-deductible charitable contributions to OTU-EF, the 'non-profit arm of Oregon Taxpayers United.'" Additionally, the court found that defendants had created yet another organization, Oregon Taxpayers Association/Union, "with the object of avoiding the judgment which will be issued based upon the Jury Verdict in this lawsuit"; that that organization used all of the same equipment and supplies as defendants; and that it used

---

[7] The court found that "OTU-EF spent 60% of its expenditures for fiscal year 1997-1998 on OTU-PAC related activities. OTU-EF spent 43% of its expenditures in fiscal year 1998-1999 on OTU-PAC related activities. OTU-EF spent 72% of its expenditures for fiscal year 1999-2000 on OTU-PAC related activities."

OTU-PAC's donor list and referred to OTU-EF as "our education foundation."

Ultimately, the court determined that defendants had

> "engaged in conduct concerning successor organizations
> * * * with the intent of circumventing the legal consequences of their actions and the pattern of racketeering
> conduct which has occurred. The wrongful conduct of the
> defendants [is] on-going, threatens to continue and it is
> probable that it will continue in the future unless an appropriate injunction is entered to prevent it."

The court concluded that, if it did not grant equitable relief, "there is a probability that defendants will continue to engage in a pattern of racketeering within the meaning of ORS 166.715(4). Injunctive relief is necessary to prevent continuation of this conduct which is probable and which threatens continued injury to the public interest."

The court then entered a judgment that awarded monetary damages (*see* 208 Or App at 355-56) and equitable relief. As described in detail below, 208 Or App at 374-76 and Appendix "A," the court dissolved OTU-EF and prohibited any successor organization of OTU-EF from making contributions to any political action committee for a period of five years. The court also prohibited OTU-PAC and any successor political action committees from receiving contributions from tax-exempt charitable organizations for a period of five years. Finally, the court enjoined OTU-PAC, OTU-EF, and their successor organizations from various specific violations of Oregon law and prohibited them from transferring or destroying assets until the judgment entered in the present case is satisfied or until further order of the court.

On appeal, defendants raise six assignments of error. In particular, defendants contend:

> (1)  The trial court erred in denying defendants' motion
> to dismiss all counts on the ground that plaintiffs could not,
> as a matter of law, establish causation of the alleged
> damages.

(2)   The trial court erred in denying defendants' motion for summary judgment on the ground that plaintiffs could not establish causation for the alleged damages.

(3)   The trial court's injunction impermissibly restrains protected expression and initiative-related conduct in violation of the Oregon Constitution.

(4)   The trial court erred in enjoining nonparties, *e.g.*, "successor organizations," from participating in future political activities.

(5)   The trial court erred in denying defendants' motion to dismiss Count 3 on the ground that it failed to sufficiently allege cognizable predicate offenses of "unsworn falsification" as defined by ORS 162.085.

(6)   The trial court erred in denying defendants' motion for a directed verdict on Count 3 on the ground that plaintiffs failed to establish that the false statements in the CT-12 forms would have caused OTU-EF to lose its status as a charitable organization.

For cogency of analysis, we begin with the fifth assignment of error and then address, in turn, the first, second, and sixth assignments of error, all of which pertain to various aspects of causation. Finally, we address the third and fourth assignments of error pertaining to the scope of injunctive relief.

Defendants assign error to the trial court's denial of their ORCP 21 A(8) motion to dismiss Count 3 on the ground that it failed to sufficiently allege cognizable predicate offenses of "unsworn falsification" as defined by ORS 162.085. Plaintiffs alleged, in pertinent part, that OTU-PAC's knowingly false submissions of C&E reports and OTU-EF's knowingly false submissions of CT-12 forms violated ORS 162.085(1). That statute provides:

"A person commits the crime of unsworn falsification if the person knowingly makes any false written statement to a public servant in connection with an application for any benefit."

On appeal, as before the trial court, defendants contend that neither the C&E reports nor the CT-12 forms constituted "application[s]" for purposes of ORS 162.085:

"Assuming for purposes of argument that OTU's filing of purely informational forms (the 'C&E reports' and 'CT-12 forms' discussed earlier) might conceivably qualify as a 'gain or advantage' in the sense that Oregon law requires the filings and one maintains the 'advantage' of abiding by the reporting requirements, nevertheless nothing about the filing of those particular informational reports constitutes, or qualifies as, an *application* for purposes of the statutory definition of 'unsworn falsification' in ORS 162.085(1). Within the context of ORS 162.085(1), the term 'application' connotes an act synonymous with 'request' or 'petition.' Yet one neither 'applies' for, nor 'requests,' [nor] 'petitions' for any 'benefit' by the filing of any such informational reports or forms."

(Emphasis in original.)

Plaintiffs respond that the C&E reports enable political action committees "to receive and spend political contributions," citing ORS 260.063, and argue that the ability to do so constitutes a benefit of the type contemplated by ORS 162.085. Plaintiffs further assert that the filing of CT-12 forms entitles charitable organizations to tax benefits, citing ORS 128.670. Defendants take issue with both of those characterizations, arguing first that C&E reports do not "enable" political action committees to do anything, but, rather, that failure to comply with the requirements for C&Es can merely lead to civil penalties, ORS 260.232, or court proceedings to require the filing of correct C&Es, ORS 260.225. Defendants further respond that the filing of CT-12 forms does not "enable" an organization to solicit tax deductible donations. They argue that, although such organizations may be fined and that court proceedings may be used to require compliance, *see* ORS 128.670 and ORS 128.710, an organization that fails to comply does not lose its ability to solicit donations, but merely is subject to having its corporate officers removed.

We begin by considering the text of ORS 162.085(1) in pertinent statutory context. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993).[8] We

---

[8] The dissent begins with a different proposition. It suggests that the legislature, in enacting ORICO, may have intended that various "election offenses" should not be treated as predicate offenses for purposes of ORICO at all. *See* 208 Or App at 383-84 (Edmonds, J., concurring in part, dissenting in part). Whatever the

focus on the requirement that the "false written statement" must be made *"in connection with* **an application** for any benefit." (Italics and boldface added.) "Benefit," as used in ORS 162.085(1) means "gain or advantage to the beneficiary or to a third person pursuant to the desire or consent of the beneficiary." ORS 162.055(1).[9] We do not understand defendants to dispute that they enjoy certain "benefits" due to their status as, respectively, a political committee (OTU-PAC) or a tax-exempt nonprofit corporation (OTU-EF).[10]

Unlike "benefit," however, there is no statutory definition of "application" for purposes of ORS 162.085(1). In common usage, an "application" as employed in ORS 162.085 means:

"APPEAL; REQUEST; PETITION ‹an ~ for a position› ‹an ~ to an underwriter for insurance›."

*Webster's Third New Int'l Dictionary* 105 (unabridged ed 2002); *see also id.* (defining "apply" as, *inter alia,* "to make an appeal or a request esp. formally and in writing and usu. for something of benefit to oneself ‹ ~ to an employer for a job› ‹ ~ to a bank for a loan›"). That usage of "an application" as connoting a "request" comports with statutory definitions of "application" in other, substantively unrelated contexts. *See, e.g.,* ORS 343.395(1) (defining "application" for purposes of "talented and gifted children" educational programs as "a request by a school district for state funds"); ORS 469.300(2) (defining "application" for purposes of energy facility siting oversight as "a request for approval" of a site).

Before proceeding further, two aspects of the statute's text and design bear emphasis. *First,* the statute is not limited to statements in an application itself; rather, it

---

abstract correctness of that proposition—which defendants have never advanced themselves—the statutory listing of predicate offenses does include both of the alleged predicate offenses here, ORS 162.085(1) (*see* ORS 166.715(6)(a)(B)); ORS 165.007(1) (*see* ORS 166.715(6)(a)(P)).

[9] By contrast, "pecuniary benefit," which is used in statutes such as the bribery statutes, ORS 162.015 to 162.035, is limited to gain or advantage "in the form of money, property, commercial interests or economic gain, but does not include a political campaign contribution reported in accordance with ORS chapter 260." ORS 162.005(1).

[10] *See, e.g.,* ORS 316.102 (tax credits available for contributions to political action committees); ORS 317.080 (tax exemptions for charitable organizations).

applies, more broadly, to any false written statement made *"in connection with"* an application for any benefit (emphasis added). *Second,* the statute does not apply to any and all false written statements made with respect to a benefit. Rather, the statement must be made in connection with "an *application"* for a benefit (emphasis added). Thus, unless there is some predicate, referent "application," the statute is inapplicable—or, stated conversely, the existence of "an application" is the *sine qua non* of culpability under ORS 162.085(1).

■ Consistently with the foregoing, there are some circumstances in which ORS 162.085(1) would clearly apply. For example, if X applied for public employment, and Y knowingly wrote a materially false letter of reference to the putative public employer in support of X's application, Y's letter would be a "false written statement to a public servant in connection with an application for any benefit." ORS 162.085(1). The circumstances of this case are, however, very different. As noted, defendants contend that their C&E reports and CT-12 filings were not made—and could not have been made—"in connection with an application for any benefit" because there was no *"application."* We agree with defendants' arguments as to OTU-PAC but not as to OTU-EF.

We begin with OTU-PAC and the false C&E reports. OTU-PAC points out, correctly, that there is no statutory requirement that an entity submit an application, which must be approved, before it can begin to operate, or continue to operate, as a political committee. Although a political committee must file an initial "statement of organization" under ORS 260.042, as well as supplemental C&E submissions as appropriate,[11] no statute provides that an entity's ability to operate as a political committee is contingent upon the Secretary of State's, or any other authority's, approval of the initial "statement of organization" or any supplemental submissions. An "application" in common usage means a "request," *see* 208 Or App at 361—and a "request" necessarily implies that the other party has *some* ability to refuse or withhold consent. With respect to an entity's status as a political committee, there is no condition of approval—and, thus, there is no "application." Thus, as OTU-PAC contends:

---

[11] *See, e.g.,* ORS 260.058 - 260.073.

"A person (or group) becomes a 'political committee' automatically (and therefore subject to reporting requirements) if he either receives a contribution for the purpose of supporting or opposing a candidate, measure or political party, or makes an expenditure for the purpose of supporting or opposing a candidate, measure or political party. He does not have to seek permission from the State to become a political committee; he is one *ipso facto*. Correspondingly, he does not have to 'apply' to continue that status."

To be sure, as plaintiffs point out, a political committee that fails to file required C&Es, or falsifies those filings, is subject to serious consequences, including civil penalties. *See, e.g.*, ORS 260.232. But the fact that the statement might be filed to *avoid* a *detriment* does not render it a statement made in connection with "an application for a *benefit*." To so construe ORS 162.085(1) would be to impermissibly "insert what has been omitted." ORS 174.010.

Because there was no "application" for purposes of ORS 162.085(1), OTU-PAC's false C&E submissions could not have been made "in connection with an application for any benefit." *Id.* Accordingly, the trial court erred in denying the motion to dismiss Count 3 as to OTU-PAC.[12]

We turn, then, to whether OTU-EF's conduct in filing fraudulent CT-12 statements violated ORS 162.085(1). We begin, again, with the meaning of "application" in this context.

OTU-EF points out, correctly, that its status as a section 501(c)(3) tax-exempt entity was not dependent upon the filing of CT-12 reports with the Oregon Department of Justice. Rather, that status is granted by the United States Internal Revenue Service. Conversely, as plaintiffs emphasize, the universe of "benefits" that OTU-EF enjoyed was not limited to its mere status as a tax-exempt entity; rather, and in particular, OTU-EF enjoyed the "gain or advantage" of being entitled to engage in fund-raising activities in Oregon. As a "charitable corporation," ORS 128.620, OTU-EF was

---

[12] That error has very significant derivative consequences with respect to the trial court's allowance of injunctive relief and some of defendants' remaining assignments of error. *See* 208 Or App at 374-76, 378-79. For now, we defer that discussion.

required to comply with the reporting requirements of ORS 128.670—and, if it failed to comply with those requirements, its fund-raising activities could be enjoined under ORS 128.866(1).[13] Thus, in plaintiffs' view, each time that OTU-EF submitted a CT-12 form, that submission represented a new and separate "application" for the benefit of being permitted to *continue* to engage in fund-raising activities. That is, there was not just one "application," but, instead, a series of continuing "applications."

We agree with plaintiffs. Nothing in the language or design of ORS 162.085 restricts "application" to a single original application. As a most obvious example, nothing in ORS 162.085(1) would preclude that statute's operation with respect to written submissions requesting renewal of a license or permit. To be sure, the circumstance presented here—in which failure to make the requisite submission can result in effective revocation of the benefit—is less simple.[14] And yet, to the extent that a person's future eligibility and entitlement to engage in "beneficial" activity is contingent upon a written submission, we perceive no material principled distinction. In this circumstance, as in the case of an original request or a renewal request, a false written submission is material to future entitlement to the benefit.[15]

---

[13] ORS 128.866 provides, in part:

"The Attorney General may obtain an injunction against solicitation of contributions until:

"(1) The charitable organization, beneficiary, professional fund raising firm or commercial fund raising firm has complied with all registration and reporting requirements of the Charitable Solicitations Act and ORS 128.610 to 128.750[.]"

[14] An analogous, and familiar, circumstance would involve a licensed attorney's submission of a minimum continuing legal education report as required under Oregon State Bar Minimum Continuing Legal Education (MCLE) Rule 7.1. Failure to complete such a report can result in suspension from bar membership. MCLE Rule 7.6.

[15] Our conclusion comports with the legislative history—which, frankly, is not very illuminating. The legislative history, albeit in cursory fashion, suggests that the legislature was concerned with efforts "to obtain 'benefits' by deception and unsworn falsification." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 185, 187 (July 1970). In that connection, the legislative history noted the existence of a variety of preexisting statutes that "prohibit unsworn falsification in official matters" and indicated that the "ultimate decisions as to [the] retention or repeal of those statutes" following the enactment of ORS 162.085 were "left to later legislative determination." *Id.*

■    We emphasize, finally, the differences between OTU-EF and OTU-PAC in that regard. Although, as noted, OTU-PAC was subject to various detriments, including potential civil fines, by reason of its false C&E submissions, those submissions were not material to OTU-PAC's continuing entitlement to the benefit of its status as a political committee. Conversely, OTU-EF's submissions of the false CT-12s were material to its continuing eligibility and beneficial entitlement to engage in fund-raising activities in Oregon. Consequently, the trial court did not err in denying OTU-EF's motion to dismiss the third count.[16]

We proceed, then, to defendants' three causation-related assignments of error. We begin with defendants' first assignment, which challenges the denial of their ORCP 21 A(8) motion to dismiss the complaints in their entirety on the ground that the damages that plaintiffs alleged, which were incurred in opposing Measures 92 and 98, were not proximately caused by defendants' alleged conduct. In particular, defendants argue that plaintiffs did not suffer "actual damages" "by reason of" any of the alleged unlawful racketeering activity, ORS 166.725(7)(a), because plaintiffs' expenditure of funds to defeat the ballot measures was not sufficiently directly related to the alleged pattern of racketeering activity. In support of their position, defendants rely primarily on

_____

[16] As noted, 208 Or App at 355, the jury awarded OEA damages of $671,658 and AFT damages of $170,000 on the third count. Although the jury answered separate special interrogatories as to OTU-PAC and OTU-EF on the third count, finding each to be liable, the verdict did not apportion the damages on that count attributable to either defendant. Rather, the jury, without differentiating between the defendants, simply stated the amount of damages awarded to OEA and AFT respectively.

Given our determination that the trial court should have dismissed the third count against OTU-PAC, this case presents, at least in the abstract, a "we can't tell" issue—*viz.*, to what extent did the jury award damages based on OTU-PAC's conduct, or did the jury view the damages resulting from defendants' conduct as coextensive? Consistently with the analysis announced in *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 61 P3d 928 (2003), we conclude that a remand is unnecessary and that the judgment against OTU-EF for the full amount of damages awarded should be affirmed. That is so because (1) as in *Shoup*, OTU-EF, as the party potentially disadvantaged by the verdict, failed to procure a verdict of sufficient particularity "to make a record that demonstrates prejudicial error," *id.* at 173; and (2) aside from its causation-related arguments, which we reject, *see* 208 Or App at 365-74, OTU-EF did not, and does not, contend that plaintiffs' proof was legally insufficient to support an award of damages in the entire amount against OTU-EF.

*Holmes v. SIPC*, 503 US 258, 112 S Ct 1311, 117 L Ed 2d 532 (1992), which construed the causation requirements in the federal racketeering law, 18 USC §§ 1961-1968, on which ORICO was modeled.[17]

In reviewing the disposition of a motion to dismiss under ORCP 21 A(8), we assume the truth of the facts alleged in the complaint, drawing all inferences in plaintiffs' favor. *See Brewer v. Dept. of Fish and Wildlife*, 167 Or App 173, 176, 2 P3d 418 (2000), *rev den*, 334 Or 693 (2002); *accord Unified Western Grocers v. PricewaterhouseCoopers*, 204 Or App 673, 676, 131 P3d 796, *rev den*, 341 Or 80 (2006) ("[I]n reviewing the denial of a motion to dismiss on real party in interest grounds, we accept the allegations in the complaint as true.").

■     Consistently with that standard of review, the operative complaints here pleaded sufficient facts to establish the requisite causation. With respect to Count 1, pertaining to falsification of the sponsorship petitions, plaintiffs alleged that the purposes of the enterprise in which defendants participated were (1) to promote the initiative measures "to eliminate or restrict the ability of [plaintiffs] to receive payment of member dues through payroll check-off"; and (2) "to force [plaintiffs] to expend [their] resources opposing such initiatives, thereby preventing [plaintiffs] from initiating and implementing programs for the improvement of public education and the working conditions of [plaintiffs'] members." The complaints further alleged, with respect to Count 1, that defendants' conduct achieved the latter purpose and that plaintiffs' expenditures to oppose the measures were reasonable and necessary and were the "expected consequence of the enterprise."

Counts 2 and 3 reiterated the allegations of defendants' intended purpose of causing plaintiffs to expend resources in opposition to the proposed measures, as well as the allegation that plaintiffs, in fact, expended funds as a result of defendants' allegedly unlawful conduct. In particular, in Count 3, plaintiffs explicitly alleged that plaintiffs

---

[17] Neither defendants nor plaintiffs contend that the standard of actionable causation under ORICO is materially different from that under RICO, as articulated in *Holmes*.

expended funds "as defendants knew and intended they would[.]" In sum, plaintiffs alleged that defendants' unlawful conduct with respect to the ballot measures caused them to expend substantial funds in opposing the ballot measures and that that expenditure was not only the foreseeable, but the specifically intended, consequence of defendants' conduct.

Defendants contend, nevertheless, that those facts are insufficient to establish actionable causation for purposes of ORICO. That is, defendants assert that, as a matter of law, plaintiffs failed to plead sufficient facts to establish that they had been "injured by reason of" defendants' unlawful conduct. ORS 166.725(7)(a). As support for their position, defendants invoke *Holmes*, which addressed the standard of causation under RICO. Defendants' reliance on *Holmes* is unavailing.

In *Holmes*, the Securities Investor Protection Corporation (SIPC), a nonprofit organization authorized by federal securities law to reimburse customers of member securities brokers who are unable to meet obligations to their customers, sought to recover damages pursuant to RICO from various defendants who allegedly had engaged in a stock manipulation scheme. 503 US at 261. SIPC's causation theory was that (1) the defendants had, in violation of the securities laws, manipulated the stock of six companies to create a misleading appearance of a liquid market; (2) as a result of that manipulation, some of SIPC's member broker-dealers had "bought substantial amounts of the stock with their own funds" for their own accounts; (3) after the defendants' scheme was discovered, the stocks plummeted, with disastrous financial consequences for the broker-dealers; (4) because of the broker-dealers' consequent insolvency and eventual liquidation, they were unable to cover their customers' claims—claims entirely unrelated to the defendants' stock manipulation—in the amount of nearly $13 million; and (5) consequently, SIPC was required to advance funds to cover those claims. *Id.* at 262. The court concluded that, in those circumstances, the causal relationship between the defendants' unlawful conduct and the injury for which SIPC sought damages was too attenuated to permit recovery.

In so holding, the Court, after noting that Congress had intended to incorporate into RICO common-law principles of proximate causation, *id.* at 268, identified several reasons that supported cutting off causation for indirect injuries:

> "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely."

*Id.* at 269-70 (citations omitted). In rejecting SIPC's theory of causation, the Court emphasized that the customers on whose behalf SIPC had sought to recover had not bought the manipulated stock:

> "[T]he link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers. That is, the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims."

*Id.* at 271; *see also Anza v. Ideal Steel Supply Corp.*, ___ US ___ , 126 S Ct 1991, 164 L Ed 2d 720 (2006) (applying *Holmes*'s proximate causation test in RICO case involving fraudulent tax returns).

Defendants assert that plaintiffs' theory of causation in the present case is similarly deficient. In particular, defendants describe plaintiffs' theories as "labyrinthine, multiple-actor, multiple-event theories." For the reasons that follow, we disagree with defendants that plaintiffs' theory of causation is too attenuated to satisfy the requirements of proximate cause.[18]

---

[18] The dissent contends that the decisional amplification of the standard for actionable causation under RICO, as articulated in *Holmes* and subsequent cases,

Causation on the facts pleaded here was not "labyrinthine." It was simple and direct. Defendants' alleged predicate acts were directed at putting several initiatives on the ballot to achieve either or both of two purposes: (1) to severely restrict or prohibit plaintiffs' abilities to collect union dues to the extent that some portion of those dues were used for political purposes—and, thus, ultimately to cripple plaintiffs' participation in the political process; and (2) to force plaintiffs to expend substantial funds to defeat the measures and, in doing so, to divert those resources from other efforts. Thus, unlike in *Holmes*, in which the chain of causation was reminiscent of the game of "Mousetrap,"[19] causation, as alleged here, was basic and blunt. Defendants intended to cause precisely this sort of injury to plaintiffs. The only contingency in producing that injury was the success of defendants' efforts.

We note, moreover, that none of the concerns with distant, indirect causation identified in *Holmes* militates against the imposition of liability here. Again, assuming the truth of plaintiffs' pleadings, "the amount of [plaintiffs'] damages attributable" to defendants' unlawful conduct is not "difficult * * * to ascertain." *Holmes*, 503 US at 269. Rather, that amount—the sums expended in opposing the measures—is precisely quantifiable, and nothing in the pleadings suggests that those expenditures were, wholly or in part, somehow attributable to "other, independent causes." *Id.* Nor do the pleadings disclose any material "risk of multiple recoveries" by absent parties "removed at different levels of injury from the violative acts." *Id.*[20] Finally, and in a related sense, the

___

is inapplicable because those decisions were rendered by federal courts after ORICO was enacted. *See* 208 Or App at 381-86, 395-97 (Edmonds, J., concurring in part, dissenting in part). We have twice at least implicitly assumed otherwise. *See Ainslie v. First Interstate Bank*, 148 Or App 162, 188, 939 P2d 125 (1997), *rev dismissed*, 326 Or 627 (1998); *Loewen v. Galligan*, 130 Or App 222, 882 P2d 104, *rev den*, 320 Or 493 (1994). As noted, *see* 208 Or App at 366 n 17, the parties on appeal invoke only the *Holmes* formulation.

In all events, even if ORICO's causation standard is not precisely congruent with RICO's causation standard, as elucidated in *Holmes*, the analysis under ORICO should, at the very least, conform to principles expressed in *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 339-42, 83 P3d 322 (2004). For the reasons described below, *see* 208 Or App at 369-70, the facts pleaded here are sufficient under either standard.

[19] Or, to others of another generation, of Rube Goldberg.

[20] Defendants contend that plaintiffs did not themselves expend funds in opposing the measures but, instead, merely made contributions to "measure

pleadings do not disclose the existence of other, more "directly injured victims," who could act more efficiently as "private attorneys general" in pursuing claims under ORICO. *Id.* at 270. The trial court properly denied defendants' ORCP 21 A(8) motion based on lack of legally cognizable causation.

■      We conclude our discussion of the first assignment of error by responding to a concern expressed in the dissent, *viz.*, that imposition of ORICO liability in these circumstances will impermissibly "chill" citizen participation in the initiative process. *See* 208 Or App at 395-96 (Edmonds, J., concurring in part, dissenting in part). We take that concern very seriously, and we respectfully disagree.

For generations of Oregonians, the initiative has been, and remains, a cherished legacy. It is not only part of our heritage but, as much, a vital, integral part of our political present and future. The initiative process was—as every Oregon school child once learned—adopted in 1902, as a feature of "the Oregon system," to remedy legislative fraud and corruption. *See generally Oregon Blue Book 2005-2006* 352-53 (2005); David Schuman, *The Origin of State Constitutional Direct Democracy: William Simon U'ren and "The Oregon System,"* 67 Temple L Rev 946 (1994).[21] The citizens

committees" formed to oppose the measures—and, thus, that those committees, and not plaintiffs, "actually spent opposition money." Defendants reason that, because the measure committees were the "more direct victims" of defendants' conduct, there is a substantial risk of multiple recovery.

Defendants' argument circumvents our standard of review for dispositions of motions under ORCP 21 A(8). *See* 208 Or App at 366. Nothing in plaintiffs' operative complaints refers to measure committees or any other entities making expenditures in opposition to the measures. In all events, to the extent that plaintiffs recover damages in the amount of their "contributions"/expenditures, a concomitant reduction of any recovery by any measure committee would not require the adoption of "complicated rules" for the apportionment of damages. *See Holmes,* 503 US at 269.

[21] Professor (now Judge) Schuman described the conditions that were the impetus for the adoption of the initiative:

"By the 1880s, Oregon politics had a national reputation for corruption and inefficiency. At least in the yellow press,

" 'the story dealing with the frauds, the bribery, the abuse of power, and misuse of money in Oregon politics, [was] a very long one, and as full of local color as any western state could ask. Fraud and force and cunning were for so many years features of Oregon politics that they came to be accepted, not only as a part of the game, but by many as the attractive feature of the game.'

"The legislature consisted of 'briefless lawyers, farmless farmers, business failures, bar-room loafers, Fourth-of-July orators, [and] political thugs.' It spent

who ratified the initiative in 1902 certainly never intended that it would confer a license for fraud and a shelter for "money laundering." The citizens of Oregon did not intend to trade governmental corruption for private corruption by individuals and interest groups.

This case is not about innocent participation in the initiative process; it is not about good faith mistakes or errors in judgment in the course of such participation. Rather, as pleaded—and as ultimately found by the jury—this case is about a calculated course of criminal conduct perpetrated for the express purpose of crippling, and even destroying, defendants' political opponents.

For the Oregonians of a century ago, the initiative process meant pure, "open" democracy—and (at least) most Oregonians would like to think that it still does. But this case involves the antithesis of that ideal: It involves cynical, criminal manipulation of the democratic process.

*That* is the conduct that is subject to ORICO liability. *That* is the conduct that is "chilled." Imposition of ORICO liability in these circumstances fully accords with Article IV, section (1), of the Oregon Constitution. *Cf. State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982) (fraud is not constitutionally protected expression for purposes of Article I, section 8, of the Oregon Constitution); *Smallwood v. Fisk*, 146 Or App 695, 698, 703, 934 P2d 557 (1997) (same).

Defendants' second assignment of error parallels their first assignment. Although the first assignment challenges the denial of an ORCP 21 A(8) motion to dismiss and the second challenges the denial of a motion for summary judgment, both are predicated upon the same arguments regarding lack of cognizable causation of damages.[22] Defendants contend, again, that there was no proximate causation

---

an inordinate amount of its time, sometimes entire sessions, electing United States Senators, although the term 'election' dignifies a process that was apparently more akin to an auction. The bidders at these auctions, who bid as well for the votes and other services of legislators, were the state's major corporate interests: timber, railroads, utilities, and banks. Distrust and resentment ran high. So did the call for reform."

*Id.* at 948-49 (quoting Allen H. Eaton, *The Oregon System: The Story of Direct Legislation in Oregon* 3 (1912) (footnotes omitted)).

[22] Indeed, appellants' briefs do not distinguish between the two assignments in presenting arguments in support of reversal.

for ORICO purposes and assert, particularly, that the predicate acts of forgery underlying the first count were not the "cause" of plaintiffs' damages because the intervening acts of the county clerks and Secretary of State in failing to detect the forged signatures and ultimately placing the initiatives on the ballot functioned, in essence, as a superseding cause of plaintiffs' damages.

■ We do not address the substance of defendants' arguments because, as presented here, defendants' challenge to the *denial* of their motion for summary judgment is not reviewable. As we explained in *York v. Bailey*, 159 Or App 341, 345-46, 976 P2d 1181, *rev den*, 329 Or 287 (1999):

> "[A]n order denying summary judgment is not reviewable following a full trial on the merits, unless the motion rests on 'purely legal contentions' that do not require the establishment of any predicate facts. *E.g., Payless Drug Stores v. Brown*, 300 Or 243, 246-48, 708 P2d 1143 (1985); *Seidel v. Time Ins. Co.*, 157 Or App 556, 560, 970 P2d 255 (1998). Purely legal contentions are 'those as to which the facts are not merely undisputed but immaterial, such as a facial challenge to the constitutionality of a statute.' *Id.* In other words, the legal theory underlying the motion must be that the moving party has a right to prevail on any set of facts and that the facts, in effect, do not matter."

Here, defendants' arguments regarding proof of "proximate cause"—or, concomitantly, the potential operation of "superseding cause"—are necessarily fact based. That is, the facts *are* material—they are *not* "not merely undisputed but immaterial[.]" *Id.* Consequently, as in *York*, the denial of defendants' summary judgment motion is not reviewable on appeal.

We proceed to the last of defendants' three causation-related assignments of error. In the sixth assignment of error, OTU-EF argues that the trial court erred in denying its motion for a directed verdict on Count 3 on the ground that plaintiffs did not prove that, as result of the falsification of the CT-12 reports, OTU-EF "would necessarily have lost its lawful status as a charitable corporation, thus rendering it unable to receive tax-deductible contributions that might have been used for the signature-gathering process for Ballot Measures 92 and 98."

■ OTU-EF's argument depends on a false first premise. To establish causation, plaintiffs did not need to prove that OTU-EF would have lost its status as a charitable organization if its unlawful activities had come to light. Rather, plaintiffs could establish causation by showing that, if the Oregon Department of Justice had been aware of those activities, it would have secured an injunction, pursuant to ORS 128.866(1), precluding OTU-EF's fund-raising activities and cutting off the flow of cash funneled to OTU-PAC to promote the initiative measures.

In reviewing the denial of a directed verdict, we view the evidence, including reasonable attendant inferences, in the light most favorable to the nonmoving party—the plaintiffs. *Hudjohn v. S&G Machinery Co.*, 200 Or App 340, 342, 114 P3d 1141 (2005). That is so because " 'the jury must be permitted to consider every claim on which the plaintiff has presented *some* evidence tending to establish each element of that claim.' " *Bolt v. Influence, Inc.*, 333 Or 572, 578, 43 P3d 425 (2002) (quoting *State v. Brown*, 306 Or 599, 602, 761 P2d 1300 (1988) (emphasis in *Brown*)). As the court emphasized in *Brown*, "[o]nly when there is no evidence to support an element may the claim be withdrawn from the jury's consideration." 306 Or at 603.

Consistently with those principles, we summarize the pertinent evidence. Sizemore, acting as an agent for OTU-EF and OTU-PAC, devised a scheme by which tax-deductible donations to OTU-EF could be secretly and unlawfully funneled to OTU-PAC and used to put Measures 92 and 98 on the November 2000 ballot. But for the unlawful scheme, the OTU-EF contributions could not have been used in that manner. The OTU-EF contributions that were unlawfully expended on OTU-PAC activities were significant. *See* 208 Or App at 357 n 7. Moreover, plaintiffs presented evidence that the unlawful scheme benefitted the OTU-EF donors because they could take tax deductions and also could shield their identities as supporters of the initiatives, which would have been revealed on accurate C&E reports had the contributions been made directly to OTU-PAC. Finally, plaintiffs presented the testimony of an expert, Pancoast, that, if OTU-EF had filed truthful CT-12 forms, the Oregon Department of Justice "almost certainly would have followed

up on that" and would have had a variety of options to pursue, including "the least of which * * * would have been a cease and desist order."

From that evidence, a finder of fact could draw reasonable inferences that OTU-EF's racketeering activity described above permitted it to obtain contributions from donors that were unlawfully used to promote ballot initiatives that were intended to—and did—cause plaintiffs to expend resources in opposition to those initiatives. A finder of fact could also reasonably infer from plaintiffs' unrebutted expert opinion evidence and from the substantial flow of funds from OTU-EF to OTU-PAC for noncharitable purposes that, if OTU-EF's unlawful use of funds to promote the ballot initiatives had come to light, the Department of Justice would have obtained an injunction against that unlawful activity and the damages suffered by plaintiffs would never have occurred.[23]

In sum, plaintiffs presented "some evidence" to support requisite causation with respect to Count 3. Consequently, the trial court properly denied defendants' motion for a directed verdict on that count.[24]

We turn, finally, to defendants' final two assignments of error, pertaining to the scope of the trial court's injunction. In their third assignment of error, defendants contend that the injunction embodies an overbroad unconstitutional "prior restraint" of political activities protected under Article I, section 8, and Article IV, sections 1 and 2, of the Oregon Constitution. In their fourth assignment of error, defendants contend that the trial court erroneously enjoined "successor organizations" to OTU-PAC and OTU-EF, who were not parties to this litigation, from engaging in various activities.

Before addressing those assignments of error, we must, logically, determine which components of the trial

---

[23] Indeed, that inference was substantiated here because the State of Oregon did ultimately intervene to seek and obtain OTU-EF's dissolution.

[24] In our analysis of defendants' first, second, and sixth assignments of error, we have addressed defendants' principal contentions regarding causation. We reject, without discussion, defendants' remaining derivative and collateral contentions.

court's injunction are affected, and even abrogated, by our determination that OTU-PAC was entitled to dismissal of Count 3. That is, to the extent that the allowance of injunctive relief against OTU-PAC—or, even arguably, derivatively, against OTU-EF—was predicated on OTU-PAC's liability on Count 3, those components of the injunction must be vacated or reversed. Once that determination is made, we can then determine whether, or to what extent, the assignments of error relate to the remaining provisions of the injunction.

Our threshold inquiry is substantially complicated by the procedural posture and, particularly, by the parties' pleadings. In seeking injunctive relief in their original and supplemental pleadings, plaintiffs did not explicitly request specific equitable relief by reference to particular counts.[25] Nor, in allowing such relief, did the trial court explicitly relate various provisions to various counts in the pleadings. *See* Appendix "A" to this opinion (reproducing injunctive provisions of trial court's judgment). Consequently, we are consigned to attempting to discern, contextually, which provisions of the injunction are unaffected by the reversal of Count 3 as to OTU-PAC.

Logically, those provisions whose substance corresponds solely to the allegations of Counts 1 and 2, on which both defendants were determined to be liable, should be unaffected by our disposition as to Count 3. Thus, paragraphs 8, 11, and 12, which pertain to initiative and signature-gathering activities, are unaffected. Similarly, those provisions that relate only to OTU-EF, and not OTU-PAC—*viz.*, paragraphs 4, 5, and 10—are unaffected. Conversely, two provisions, paragraphs 6 and 9, name only OTU-PAC and correspond solely to the substance of Count 3; accordingly, those provisions must be reversed in their entirety.

That leaves two provisions—paragraphs 7 and 13. Paragraph 7 names both defendants but is "holistic" in nature:

---

[25] We note, however, that the state's pleadings, while not so stating expressly, appear to have been predicated solely upon allegations corresponding to Count 3 in plaintiffs' complaints.

"OTU-PAC and OTU-EF and their successor organizations and successor political action committees which are jointly referred to as 'OTU successors' are hereby enjoined from transferring or destroying any of their assets, whether cash, personal property or real property, and including documents, computers, and computer hardware, software and files, and are so enjoined until the judgment entered in this action is fully satisfied or until further order of this Court."

We cannot tell, from the pleadings or the judgment, whether the trial court would have entered paragraph 7 against OTU-PAC based solely on that defendant's liability on Counts 1 or 2, without reference to Count 3. Accordingly, we vacate paragraph 7 as to OTU-PAC but not OTU-EF. Finally, paragraph 13 names both defendants and pertains solely to the substance of Count 3:

"OTU-PAC and OTU-EF and their OTU successors are hereby enjoined from any violation of Oregon law in connection with the filing or submission of CT-12 Reports, Form 990s and C&E Reports."

We reverse that provision as to OTU-PAC but not OTU-EF.

In sum, paragraphs 4, 5, 8, 10, 11, and 12 in their entirety and paragraphs 7 and 13, as they apply to OTU-EF, are unaffected by our disposition of Count 3. With those portions of the trial court's injunction as "referents," we return to defendants' final two assignments of error.

In their fourth assignment of error, defendants assert that the injunction erroneously applies to unspecified Oregon Taxpayers United "successor organizations" who were not parties to the litigation—and, indeed, may not yet exist.[26]

---

[26] For example, paragraph 5 of the judgment provides:

"OTU-EF successor organizations are hereby enjoined from making any contributions or providing anything of value, including loans or in-kind contributions, to any political action committee and are so enjoined for a period of five years from the date the judgment is entered in this action. An 'OTU-EF successor organization' is defined as any educational foundation, or similar organization, that is eligible for I.R.C. § 501(c)(3) tax exempt status in which Bill Sizemore is a manager, officer, director, trustee, or controlling person of the successor organization or otherwise participates, directly or indirectly, in the direction or control of the activities of the OTU-EF successor organization."

■■■■■ That contention founders on the "well-established principle of law that plaintiffs may assert only their own legal rights and cannot rest their claim upon the legal rights of third parties." *Kelly v. Silver*, 25 Or App 441, 452, 549 P2d 1134, *rev den* (1976). That principle is equally apt as to defendants' objections to the scope of relief granted to plaintiffs and intervenor as it pertains to nonparties. Although the term "standing" often is used to describe a plaintiff's ability to seek relief in the first instance, a party appealing a judgment also must demonstrate standing. In *Utsey v. Coos County*, 176 Or App 524, 543, 32 P3d 933 (2001), *rev dismissed*, 335 Or 217 (2003), we stated that "[t]o have standing, *the person invoking the jurisdiction of the courts* must establish that a decision would have a practical effect on him or her." (Emphasis in original.) *See also Just v. City of Lebanon (A122517)*, 193 Or App 132, 147-48, 88 P3d 312, *rev allowed*, 337 Or 247 (2004) (applying that principle to party seeking to invoke jurisdiction of appellate court).

Here, no justiciable controversy exists between the parties as to whether plaintiffs and intervenor are entitled to injunctive or declaratory relief pertaining to entities *other than* defendants because defendants have not demonstrated that obtaining relief for such other entities would have any practical effect on defendants.[27] Finally, plaintiffs note, and we agree, that those affected by an injunction that were not parties to the original proceeding have adequate legal remedies available to them. *See Polygon Northwest v. NSP Development, Inc.*, 194 Or App 661, 667-69, 96 P3d 837 (2004) (describing ways in which nonparties affected by court order could seek relief). In sum, defendants' arguments concerning the scope of the injunction as to nonparties do not present a justiciable controversy in this proceeding.

---

[27] We recognize that there may be situations in which a plaintiff's entitlement to relief from one entity could have a significant effect on its entitlement to relief from another. The present dispute, however, does not involve question as to whom plaintiffs are entitled to recover from or who is responsible for what amount of damages. We see no way in which the injunctive relief granted in relation to nonparties in this case could have any effect on the nature or extent of defendants' obligations under the judgment.

■    Finally, in their third assignment of error, defendants raise various constitutional challenges to the scope of the injunction, particularly paragraphs 5 and 6,[28] arguing that it is overbroad and effects a "prior restraint" of political speech and activities protected under Article I, section 8, and Article IV, sections 1 and 2, of the Oregon Constitution. We do not describe those contentions in detail because, whatever their abstract merit, they have no concrete application in this case for three salient reasons:

*First*, although OTU-EF raises a variety of challenges to provisions of the injunction restraining the future ability to make political contributions, including in support of initiatives, OTU-EF does not, so far as we can tell, challenge paragraph 4 of the judgment: "OTU-EF is hereby dissolved." Indeed, while appellants' opening brief specifically refers to other paragraphs in the judgment—*viz.*, paragraphs 5 and 6—it includes no mention whatsoever of paragraph 4. With paragraph 4 in place, unchallenged—that is, with OTU-EF "dissolved"—OTU-EF's contentions regarding a possible prior restraint are hypothetical.

*Second*, to the extent that defendants complain about allegedly unconstitutional restraints imposed on non-party "successor" entities, those complaints are nonjusticiable. *See* 208 Or App at 376-77.

*Third*, to the extent that OTU-PAC asserts that the limitations on its receipt of funds, as specified in paragraph 6 of the judgment, are unconstitutionally overbroad and

---

[28] Paragraph 5 is set out above. 208 Or App at 376 n 26. Paragraph 6 provides:

"OTU-PAC and its successor political action committees are hereby enjoined from receiving any contribution of anything of value from any I.R.C. § 501(c)(3) organization, including but not limited to OTU-EF or any OTU-EF successor organization, and are so enjoined for a period of five years from the date the judgment is entered in this action. An 'OTU-PAC successor political action committee' is defined as a political action committee in which Bill Sizemore is a director or treasurer or chief petitioner of the successor political action committee, or otherwise participates, directly or indirectly, in the direction or control of the activities of the successor political action committee, and shall include but not be limited to the Committee to Restore Freedom in the Workplace, No More Political Fund-raising at Taxpayer Expense, Just Compensation for Regulatory Takings Committee, Committee to Preserve Self Government, Committee for Teacher Merit Pay, No New Taxes Without a Vote Committee, and Oregonians Against Double Taxation."

restrictive, we have now reversed that provision of the injunction. *See* 208 Or App at 375. We do not understand OTU-PAC to raise any constitutional challenge to any other portion of the injunction.[29]

Thus, defendants' third assignment of error fails.

Recapitulation is due: The trial court erred in denying OTU-PAC's motion to dismiss Count 3 and in enjoining OTU-PAC based on liability on Count 3. We affirm the trial court in all other respects.

Judgment against Oregon Taxpayers United PAC on Count 3 reversed; paragraphs 6 and 9 of judgment reversed; paragraph 13 reversed as to Oregon Taxpayers United PAC; paragraph 7 vacated as to Oregon Taxpayers United PAC and remanded; otherwise affirmed.

**EDMONDS, J.,** concurring in part, dissenting in part.

This case involves an action for money damages brought under Oregon's Racketeer Influenced and Corrupt Organization Act, ORS 166.715 to 166.735, and commonly known as ORICO. The named parties to this proceeding are American Federation of Teachers (AFT) and the Oregon Education Association (OEA), plaintiffs, the Oregon Taxpayers United PAC (OTU-PAC) and Oregon Taxpayers United Education Foundation (OTU-EF), defendants, and the State of Oregon (state), intervenor. Defendants appeal after the trial court entered judgment awarding money damages to plaintiffs on Counts 1 and 3 of their claims and enjoining defendants, their successor political committees, and Bill Sizemore from receiving political contributions in the future.[1]

Plaintiffs allege that employees and agents of defendants engaged in racketeering activities by forging signatures on statements of sponsorship and initiative petitions and by submitting false contribution and expenditure reports

---

[29] In particular, we do not understand OTU-PAC to contend that enjoining future *unlawful* conduct—*e.g.*, violations of election laws governing submission of statements of sponsorship or initiative signature sheets (*see* Judgment, ¶¶ 11, 12)—would somehow violate Article IV, sections 1 or 2, of the Oregon Constitution.

[1] The jury found that neither OEA nor AFT had been "damaged" with regard to the "Count 2" claims.

and that, as a result of those activities, plaintiffs were required to expend resources in opposition to the measures in order to defeat them. In their first assignment of error, defendants contend that the trial court erred when it denied their motions under ORCP 21 A to dismiss plaintiffs' claims on the ground that plaintiffs' claims for damages are not legally cognizable because it appears from the face of the complaints that the plaintiffs' expenditures to oppose the ballot measures were not directly caused by defendants' wrongdoing. For the reasons that follow, I agree with defendants' argument and therefore would reverse plaintiffs' judgment for money damages.

The second part of the appeal concerns the injunctive relief that was awarded to the state against defendants, their successor organizations, and Sizemore, the person whom the trial court found was actively involved in the wrongdoing that is the subject of this case. For the reasons explained more fully below, the grant of injunctive relief in this case, in some particulars, extended beyond that authorized by law.

## I. PLAINTIFFS' CLAIMS UNDER ORICO FOR MONEY DAMAGES

Plaintiffs' claims arise under ORS 166.725(7)(a), which provides:

> "Any person who is injured *by reason of* any violation of the provisions of ORS 166.720(1) to (4) shall have a cause of action for three-fold the actual damages sustained, and, when appropriate, punitive damages."

(Emphasis added.) Plaintiffs allege in Counts 1 and 3 of their complaints that defendants committed certain election offenses in procuring sponsorship signatures for initiative measures and in filing false campaign financing and expenditure reports. They also allege that they were injured by reason of those offenses when they were required to expend monies in order to defeat the measures.

Defendants argue that plaintiffs are not persons who have been injured "by reason of" a violation of ORICO because liability under the act requires direct uninterrupted causation between the violations of the act and the injury

complained of by the plaintiff. Pointing to the federal analogue of the Oregon act, they explain,

> "RICO civil liability requires more than 'but for,' or 'factual,' causation—much more; 'but for' causation, although certainly necessary, has never proven sufficient for RICO purposes, as the Supreme Court made plain in *Holmes v. Sec. Investor Prot. Corp.*, 503 US 258, 265-71, 112 S Ct 1311, 1316-19, 117 LEd 2d 532 (1992)[.]"

Indeed, the Court in *Holmes* required that there be some "direct" relationship between the injury asserted and the RICO violations before liability arises under the federal act. 503 US at 268-69. Thus, some federal courts have held that a direct relationship between the injury and the alleged wrongdoing is one of the central elements of the federal RICO act and have applied a three-factor "remoteness" test based on *Holmes* to determine whether a plaintiff's injury is too remote from a defendant's alleged wrongdoing to allow recovery.[2] *See, e.g.*, *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Incorporated*, 185 F3d 957 (9th Cir 1999) (affirming grant of judgment on the pleadings to defendants on claims that alleged injury suffered by employee health and welfare benefit plans was too remote from alleged wrongdoing of tobacco companies, nonprofit research councils, and public relations firm that allegedly misrepresented and concealed information about health risks of smoking).

It is obvious, however, that the Supreme Court's interpretation of the federal statute in *Holmes* in 1992 and its three-part test for "remoteness" could not have been the meaning of the words "by reason of" in ORS 166.725(7)(a) that the Oregon legislature had in mind in 1981. *See State v. Cooper*, 319 Or 162, 168, 874 P2d 822 (1994) (holding that, when the Oregon legislature enacts a statute modeled after the statute of another jurisdiction, an interpretation of that statute by the highest court of that jurisdiction rendered

---

[2] The "remoteness" test examines (1) whether there are more direct victims of the alleged wrongful conduct who are available to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to the defendant's wrongful conduct; and (3) whether courts would be required to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries. *Holmes*, 503 US at 269-70.

*before* the enactment of the statute by the legislature is considered the interpretation intended by the Oregon legislature). Moreover, the "remoteness" test used by *Holmes* and the federal courts is derived from *Associated Gen. Contractors v. California State Council of Carpenters*, 459 US 519, 103 S Ct 897, 74 LEd 2d 723 (1983), which interpreted the words "by reason of" in the Clayton Act. In addition, insofar as I can ascertain, no Oregon appellate court has interpreted the phrase "by reason of" in ORICO with the exception of this court in *Ainslie v. First Interstate Bank*, 148 Or App 162, 187-90, 939 P2d 125 (1997), *rev dismissed*, 326 Or 627 (1998), and in *Loewen v. Galligan*, 130 Or App 222, 230-32, 882 P2d 104, *rev den*, 320 Or 493 (1994).

In *Ainslie*, however, we did not undertake the analysis required by *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), and the template that it established. Indeed, the defendant in *Ainslie* pointed to the fact that the federal courts have used something akin to a "proximate cause" standard, which in their view demands a direct connection between the injury asserted and the injurious conduct alleged, in order to legally limit a person's responsibility for the consequences of that person's act based on concepts of what justice demands and what is administratively possible and convenient. The defendant suggested that the injuries asserted by the plaintiffs were not "reasonably foreseeable" in light of what the plaintiffs claimed were ORICO violations. In response to the defendant's application of concepts, and without adopting the defendant's terminology or legal theses, we agreed with the defendant's conclusion that, under the plaintiffs' theory of damages, "their proof supports nothing but speculation" and "[i]t is simply an imponderable" whether the plaintiffs had been injured by the defendant's violations. *Ainslie*, 148 Or App at 189.

In *Loewen*, the issue was whether former shareholders could bring an ORICO action against a corporation, its directors, and other entities who were involved in a business transaction with the corporation. Observing that the plaintiffs' claim was based on the language of ORS 166.720 and that that language was analogous to the federal RICO act, we followed the lead of federal courts who had considered similar questions and held that, if the claim was derivative, then the

aggrieved shareholders had no standing to bring an ORICO claim. 130 Or App at 231. Thus, unaided by any controlling judicial interpretation of the phrase "by reason of" in ORS 166.725(7)(a), we are left to employ the ordinary rules of statutory construction under *PGE*.

Our overarching task is to discern the intent of the legislature. ORS 174.020. The best evidence of the legislature's intent are the words of the statute themselves. Unless the legislature has assigned a specialized meaning to them, which it has not done here, the words "by reason of" in the statute are to be given their ordinary meaning. The ordinary meaning of the word "reason" in the phrase "by reason of" in ORS 166.725(7)(a) means "**c**: a sufficient ground of explanation or of logical defense; *esp* **:** a general principal, law, or warranted presumption that supports a conclusion, explains a fact, or validates a course of conduct[.]" *Websters Third New Int'l Dictionary* 1891 (unabridged ed 2002). That general definition of the word "reason" is not particularly helpful for our purposes until it is put into the context of ORICO.

When the legislature enacted ORICO in 1981, its definition of "racketeering activity" included election offenses defined in *former* ORS 260.542, *repealed by* Oregon Laws 1993, chapter 383, section 1; ORS 260.575; and ORS 260.665. ORS 166.715(5)(a)(V) (1981). *Former* ORS 260.542 prohibited the use of the term "reelect" in any campaign material unless it satisfied certain requirements. ORS 260.575 and ORS 260.665 remain in the current version of ORICO as predicate offenses. ORS 260.575 makes it unlawful to use threats or intimidation for the purpose of extorting money involving initiative, referendum, and recall petitions. ORS 260.665 makes "undue influence" that affects voting and other aspects of political campaigns unlawful. "Undue influence" is defined as "force, violence, restraint or the threat of it, inflicting injury, damage, harm, loss of employment or other loss or the threat of it, or giving or promising to give money, employment or other thing of value." ORS 260.665(1).

The fact that the 1981 legislature expressly contemplated that some election offenses but not others could operate as predicate offenses for purposes of ORICO gives rise to an inference that the omission of nonlisted election offenses

as predicate offenses in ORICO was purposeful.[3] *PGE*, 317 Or at 611. Applying that inference leads to the following reasoning. Under the current version of ORICO, ORS 166.715(6)(a)(V) lists violations of ORS 260.575 and ORS 260.665 as predicate offenses. ORS 166.720 defines what constitutes unlawful racketeering activity based on the commission of the predicate offenses listed in ORS 166.715(6)(a). ORS 166.725(7)(a) provides that "[a]ny person who is injured by reason of any violation of the provisions of ORS 166.720(1) to (4) shall have a cause of action for * * * damages[.]" Thus, when all three statutes are read in combination, ORS 166.725(7)(a) provides for a cause of action for damages that arise "by reason of" racketeering activity involving the commission of the predicate crimes listed in ORS 166.715(6)(a). The legislature's failure to include in ORS 166.715(6)(a) the election offenses that defendants allegedly committed gives rise to an inference that the legislature did not intend those omitted election offenses to operate as predicate offenses for purposes of ORICO. *See, e.g., Perlenfein and Perlenfein*, 316 Or 16, 22, 848 P2d 604 (1993) (holding that when the legislature uses a particular term in one provision of a statute but omits that same term in a parallel and related provision, it can be inferred that the omission was deliberate). Nonetheless, our court has held that the maxim *"expressio unius est exclusio alterius"* (the expression of one is to the exclusion of another) is merely a guide to understanding legislative intent and is not conclusive on that question. *State ex rel City of Powers v. Coos County Airport*, 201 Or App 222, 234, 119 P3d 225 (2005), *rev den*, 341 Or 197 (2006). Thus, the text and the context of the statute are not necessarily dispositive regarding the issue presented in this case, and I turn to the legislative history underlying the statute.

My review of the Oregon legislative history does not reveal any controlling statements by the legislature as to what it intended, other than that the statute was intended to be a counterpart to the federal RICO statute. If, after consideration of the text, context, and legislative history of a

---

[3] The same inference arises from the fact that not all predicate offenses are subject to the treble damage provision in ORS 166.725(7)(a). *See, e.g.,* ORS 166.725(7)(a)(B) (providing that the election statutes listed in ORS 166.715(6)(a) are subject to a treble damage award, but other enumerated offenses are not).

statute, the intent of the legislature remains unclear, we are required to resort to statutory construction maxims including the maxim that we construe a statute how the legislature would have intended the statute to be applied, had it considered the issue before us. *PGE*, 317 Or at 612. Certainly, the federal legislative history underlying the federal counterpart would have been persuasive to the Oregon legislature had it considered the issue presented by this case, inasmuch as the legislature intended ORICO to constitute Oregon's version of the federal RICO act. *Cf. McKean-Coffman v. Employment Div.*, 312 Or 543, 550, 824 P2d 410 (1992) (holding that because Oregon adopted language from the Federal Unemployment Tax Act virtually verbatim, federal legislative history was persuasive in interpreting the Oregon analogue).

That reasoning causes the analysis to return to what the *Holmes* Court said about Congress's intent when it enacted the federal RICO act. The Court explained:

> "We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in §7 of the Sherman Act, and later in the Clayton Act §4. It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them. Proximate cause is thus required."

*Holmes*, 503 US at 268 (citations omitted).

Also, in *State v. Blossom*, 88 Or App 75, 744 P2d 281 (1987), *rev den*, 305 Or 22 (1988), we observed that ORICO was modeled after the federal RICO statute, 18 USC sections 1961 to 1968, and for purposes of interpreting an ORICO statute, we reasoned that it was likely that the Oregon legislature would have had the same intent that Congress had regarding the federal analogue. In light of our reasoning in *Blossom* and what the *Holmes* Court said about Congress's intent, I would hold that, when the Oregon legislature enacted the RICO act and more particularly, ORS 166.725(7)(a), had it considered the issue before us and the legislative history underlying the federal act, it would have intended a "proximate cause" standard for purposes of applying the "by reason of" language in the statute. However, some

further definition is necessary to explain what the 1981 legislature would have understood about the concept of "proximate cause" before that test can be applied in this case.

The concept of "proximate cause" in tort law in Oregon finds its roots in the common law. Historically, for purposes of common-law tort liability in Oregon, there must have been more than "but for" causation for liability for an injury to exist. Rather, "proximate" cause, also known as "legal cause," was required before a person could be held legally responsible for conduct that was a part of the chain of causation of an injury. *Sworden v. Gross*, 243 Or 83, 86, 409 P2d 897 (1966). Under the common law, a "remote" cause was not a "legal" or "proximate cause" of an injury. In contrast to a "remote" cause, a proximate cause of injury was an injury that "continuously extend[ed] through every event, fact, act and occurrence related to the tortious conduct of the defendant and [was] itself the logical and natural cause of the injury complained of." *Zickrick v. Cooke et al.*, 197 Or 87, 92, 252 P2d 185 (1953). Also, the connection between a tortious act and the plaintiff's injury could be broken by an intervening cause that either supersedes earlier causes or by its nature makes the intervening cause the proximate or legally responsible cause. *Johnson v. Hoffman et al.*, 132 Or 46, 56, 284 P 567 (1930).

Thus, in creating statutory tort liability under ORS 166.275(7)(a), the legislature would likely have relied on its understanding of the common-law concept of "legal" or "proximate cause." Because that concept is the likely meaning that the legislature would have afforded to the words "by reason of" in the statute, it follows that the legislature would not have intended for every event in a chain of causation to give rise to liability for a plaintiff's injury. Said otherwise, it is likely that the legislature would have intended the statute to regard as actionable only the *direct* results of a defendant's racketeering activity. *Cf. Chambers v. Everding & Farrell*, 71 Or 521, 143 P 616 (1914).[4]

---

[4] Oregon courts no longer use a proximate cause standard. Under the present law, legal responsibility depends on what is the "reasonably foreseeable result" of the defendant's wrongful conduct. *See, e.g., Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 344, 83 P3d 322 (2004) (holding that even if a plaintiff proves in a common-law negligence claim factual or "but for" causation, there

To summarize: The issue before us is whether the legislature intended plaintiffs' claims, as alleged, to be actionable based on defendants' racketeering activity. What we know about the legislature's intent in 1981 is the following. It intended to model ORICO after the federal law. Presumably, in 1981, the legislature would have been aware of the concept of "proximate cause" as interpreted by Oregon common law. The legislature would also have been aware of the provisions of ORS 174.010, which require courts in the construction of a statute "simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted[.]" Finally, the legislature would have been aware of the rule of statutory construction employed by courts that the inclusion of one statutory term implies that the legislature intended to exclude other related terms.[5]

With those principles in mind, I turn in greater detail to the allegations in plaintiff AFT's second amended complaint and plaintiff OEA's third amended complaint that were the subject of defendants' ORCP 21 A motion. There are two preliminary caveats to keep in mind with regard to the following discussion: First, the operative language in each complaint is similar, if not identical. Second, the jury ultimately found for defendants on plaintiffs' second count on the basis that plaintiffs had not been damaged by defendants' ORICO signature-gathering violations.[6]

In response to defendants' ORCP 21 A motion, plaintiff AFT grouped its claims into three counts and characterized them to the trial court as follows:

---

remains the issue of whether there is legal responsibility for the plaintiff's harm). But because the Oregon Supreme Court first rejected the use of traditional concepts of proximate or legal cause in *Fazzolari v. Portland School Dist. No 1J*, 303 Or 1, 734 P2d 1326 (1987), some six years after the Oregon legislature enacted ORICO, the legislature would not have had the benefit of that case law. *See also Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993) (holding that as a matter of law, a prison escapee's crimes committed two days after his escape were not the reasonably foreseeable consequence of a prison employee's failure to remove the keys from the prison van from which the inmate escaped).

[5] The principle that a statute limiting a thing to be done in a particular manner implies that it shall not be done otherwise appears in the Oregon common law as early as 1908. *See, e.g., Scott v. Ford*, 52 Or 288, 97 P 99 (1908).

[6] Thus, for purposes of this appeal, there is no need to consider the legal sufficiency of the allegations in plaintiffs' second count.

"The first count involves criminal activity on gathering signatures on the sponsorship petitions for Measures 92 and 98; the second count involves criminal activity in gathering signatures in order to place Measures 92 and 98 on the ballot; and the third count involves criminal activity in raising and reporting funds to place Ballot Measures 92 and 98 on the ballot."

AFT also alleged that, "[a]s a result of the racketeering activities of Defendant's agents, Plaintiff expended funds, as Defendants knew they would, by contributing to campaigns to oppose Measure 92 and 98." Similarly, Plaintiff OEA explained to the trial court,

"Plaintiff's complaint is organized in three counts. The first count involves criminal activity in gathering signatures on the sponsorship petitions for Measures 92 and 98; the second count involves criminal activity in gathering signatures in order to place Measures 92 and 98 on the ballot; and the third count involves criminal activity in raising and reporting funds to place Ballot Measures 92 and 98 on the ballot."

Plaintiff OEA further alleged that "[t]he further purpose of the enterprise was to force plaintiff to expend its resources opposing such initiatives, thereby preventing plaintiff from initiating and implementing programs for improvement of public education and the working conditions of plaintiff's members."

For purposes of defendants' ORCP 21 A motion, we presume that all of the facts alleged above are true, and we give plaintiffs the benefit of all reasonable inferences that arise from those facts. The issue then, when properly framed, is whether the above allegations state legally cognizable claims for damages under ORICO. Defendants argue that there is no direct connection for purposes of ORICO between the allegations that its agents submitted false signatures on the sponsorship petitions for the ballot measures and made false expenditure reports to the Secretary of State and the injury for which plaintiffs seek compensatory damages, *i.e,* the expenditures of monies by plaintiffs to oppose the ballot measures. Plaintiffs counter that their

"losses are direct, not derivative; defendants' racketeering activity certainly resulted in plaintiffs' need to expend funds. While it may be true that the public at large was victimized by Highley's crimes, the public was not affected as directly as were plaintiffs. One of the objectives of the enterprise was to place initiative measures on the ballots to limit plaintiffs' ability to conduct business and to force plaintiffs to expend money to fight the measures. While the criminal activities affect other people, plaintiffs' claims are not derivative of the damages suffered by the electorate at large."

It can be easily said, based on the above allegations, that plaintiffs allege a "factual" or "but-for" causation, *i.e.*, that there is a causal link between defendants' conduct and plaintiffs' harm, but there remains the issue of legal responsibility under ORICO. One subissue involving legal responsibility is whether the complaints allege ORICO violations that are too remote to plaintiffs' injury to make them actionable under ORS 166.275(7)(a). Another subissue involving legal responsibility is whether the intervening events occurring after the violations operate, in accordance with the legislature's intention, to interrupt the chain of legal causation with respect to the alleged violations and plaintiffs' injuries.[7]

With regard to the issue of remoteness, the *Zickrick* court explained:

"The essence of the rule is found in the maxim '*Causa proxima, non remota spectatur.*' The proximate, as distinguished from the remote cause, 'involves the idea of continuity, that the negligent act continuously extends through every event, fact, act and occurrence related to the tortious conduct of the defendant and is itself the logical and natural cause of the injury complained of.'"

197 Or at 92 (quoting 1 *Shearman and Redfield on Negligence* (rev ed) 92, § 33).

Plaintiffs' Count 1 claims, as alleged, do not satisfy the above maxim. They allege that Kelli Highley, as an

---

[7] In *Holmes*, the Court opined, "the very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades this Court that RICO should not get such an expansive reading." 503 US at 266.

"employee" and "agent" of defendants, committed racketeering activity that included falsifying information regarding sponsorship statements and that

> "As a result of Highley's racketeering activities, Measure 92 and Measure 98 were approved by the Oregon Secretary of State for circulation pursuant to ORS 250.045(1). Thereafter Defendants circulated the petitions and obtained sufficient signatures to place Measures 92 and 98 on the 2000 general election ballot.
>
> "* * * * *
>
> "As a result of Highley's racketeering activities, Plaintiff[s] expended funds in its efforts to oppose certification of the ballot titles, and by contributing to campaigns to oppose these measures."

Plaintiffs' injury, as alleged above, was the expenditure of monies to oppose the measures once they were on the ballot.[8] The harm-producing event that ultimately caused plaintiffs' injury was the fact that the measures were certified by the Secretary of State to be on the ballot. Until that event occurred, there was nothing legally in place for plaintiffs to oppose. Rather, the forgeries of the sponsorship statements occurred long before the measures were placed on the ballot by the Secretary of State.

Under ORS 250.045(1), before circulating a petition to initiate a state measure, a petitioner must file with the Secretary of State a prospective petition accompanied by a statement of sponsorship signed by at least 25 electors. The signatures in the statement of sponsorship must be accompanied by a certificate of the county clerk of each county in which the sponsors reside, stating the number of signatures believed to be genuine. When a prospective petition for a state measure is filed, the Secretary of State forwards the

---

[8] According to plaintiffs' complaints, they also expended monies to oppose the certification of the ballot titles before the Secretary of State placed the measures on the ballot. Presumably, plaintiffs are referring to attorney fees incurred in that effort. While plaintiffs certainly have the right to expend monies at any stage of the initiative process that they choose to prevent an effort to place a measure on the ballot, I am unaware of any statute enacted by the legislature that provides a remedy to recoup those kinds of expenditures, particularly in light of the general principle that attorney fees are not awardable, absent a statute or contract that provides for their recovery.

proposed petition to the Attorney General, who supplies a draft ballot title pursuant to ORS 250.065(2). The Secretary of State then provides notice of the public's right to comment and supplies the Attorney General with all timely comments as required by ORS 250.067(1). After receiving any comments, the Attorney General then certifies the ballot title to the Secretary of State. That decision is subject to review by the Supreme Court. Following that review, if any, the petitioners of the initiative may circulate the proposed petition for elector signatures. To qualify for the ballot, a petition to put an initiative amendment to the constitution on the ballot must be signed by a number of qualified voters equal to eight percent of the total number of votes cast for the office of Governor at the election at which a Governor was elected preceding the filing of the petition. Or Const, Art IV, § 1(2)(c). An initiative petition relating to a state measure must then be filed with the Secretary of State for the purpose of verifying whether the petition contains the required number of signatures of electors. If the requisite number of signatures is verified by the Secretary of State, the measure qualifies for the ballot.

In light of the number of steps involved in the above process, the forgeries of the statements of sponsorship were not a direct, but rather a remote, cause of plaintiffs' expenditures. ORS 250.045(1) directly addresses that issue by placing the responsibility on county clerks of the counties in which the electors reside to certify whether the signatures are genuine. That procedure is followed by other steps in the process before the harm-producing force of plaintiffs' expenditures opposing certification of the ballot titles and the measures themselves occurred. The logical consequence of forging sponsorship statements was already an accomplished fact "before the forces were set in motion which resulted in the injury to plaintiff[s]." *Zickrick*, 197 Or at 95. Even when plaintiffs' allegations are viewed in the light most favorable to them, the forged sponsorship statements are not a direct harm-producing event that caused plaintiffs' alleged injuries. In light of the legislature's inclusion of other election offenses in the list of predicate crimes and the remoteness of defendants' ORICO violations to plaintiffs' injuries, it is unlikely that the legislature would have intended that plaintiffs could

recover damages under the circumstances alleged. Accordingly, the trial court should have granted defendants' ORCP 21 motion as to plaintiffs' allegations under Count 1.[9]

Plaintiffs' Count 3 claims involve the filing of false contribution and expenditure forms. Plaintiffs allege that defendants were required by Oregon law as a political action committee to file periodic contribution and expenditure reports. They also allege that for the years 1998 through 2000, "William Sizemore and Becky Miller, acting as agents of OTU-PAC, signed and filed" false reports concerning Measures 92 and 98 "knowing such reports to contain false written statements, including misstatements on the amount of funds received by OTU-EF and other contributors for use by OTU-PAC." They further allege that the "forms were intentionally false, concealing the actual use of funds raised by OTU-EF to support OTU-PAC activity related to Measures 92 and 98, concealing the source of contributions to Measures 92 and 98, and enabling more funds to be raised to support Measures 92 and 98 through the tax exempt OTU-EF." Finally, they allege, "As a result of the agents' racketeering activities, Defendants were able to raise the necessary funds to collect signatures to qualify Measures 92 and 98 for the 2000 general election ballot."

Thus, giving plaintiffs the benefit of all reasonable inferences from their allegations, it can be inferred that, had defendants not falsified their campaign and expenditure reports, they would have been unable to raise or allocate sufficient monies to obtain enough signatures to place their measures on the ballot. Here, in contrast to their first count, plaintiffs allege a *more* direct cause of their injury, *i.e.*, that the falsifying of campaign and finance reports resulted in defendants being able to obtain enough signatures, which resulted in them being able to qualify their measures for the

---

[9] Defendants also argue that each county clerk's certification that the signatures on the statements of sponsorship were genuine in accordance with ORS 250.045(1) operated as an intervening and superseding cause that prevents defendants from being held legally responsible for plaintiffs' expenditures in opposition to the measures. See the following discussion regarding the effect of ORS 250.045. 208 Or App at 394.

ballot.[10] Nonetheless, with regard to plaintiffs' third count, there remains the question of the legal responsibility of defendants for plaintiffs' expenditures to defeat the measures after their certification by the Secretary of State for placement on the ballot.

Two initial observations need to be kept in mind in assessing the legislature's intent in that regard. First, the more direct harm-producing event that caused plaintiffs' alleged injury is the fact that defendants were able to procure enough signatures to get the measures on the ballot rather than the filing of falsified campaign financial reports. Second, the certification of the petition signatures presented to the Secretary of State by defendants preceded the ballots being placed on the ballot, the direct harm-producing event under plaintiffs' theory.

The general common-law rule was that, where it appeared from the complaint that between the defendant's act and the plaintiff's injury there had intervened an independent cause without which the injury would not have happened, the latter will be held to be the proximate cause of the loss and the defendant will be excused from liability. *See, e.g., Aune v. Oregon Trunk Railway*, 151 Or 622, 633, 51 P2d 663 (1935) (affirming the dismissal of an action for damages resulting from the burning of the plaintiff's buildings caused by a fire started by "hobos" in the defendant's railroad car). Applying the general rule to the context of this case, it can easily be said that, without the Secretary of State's certification of the signatures, the ballot measures that produced plaintiffs' injury would not have been placed on the ballot. Thus, in the context of ORICO, it could be argued that plaintiffs' injury did not occur *directly* "by reason of" defendants'

---

[10] The majority rejects defendants' argument that plaintiffs' theory of causation is too attenuated to satisfy the requirements of proximate cause based on defendants' motivation in putting several initiatives on the ballot to stretch plaintiffs' ability to collect dues from their union members thereby restricting their participation in the political process and to force them to expend substantial monies to defeat the measures so as to divert those resources from other efforts. 208 Or App at 368. That argument appears to beg the proper question, which is whether plaintiffs have been injured by reason of "any violation of the provisions of ORS 166.720(1) to (4)." Assuming without deciding that defendants' motivations were malevolent, those motivations do not violate any criminal or ORICO statute of which I am aware.

campaign report violations, but "by reason of" the placement of the ballot measures on the ballot, and it follows, for that reason, that defendants would not be responsible under ORS 166.725(7)(a) for plaintiffs' expenditures.

Nevertheless, the provisions of ORS 166.715 to 166.735 "shall be liberally construed to effectuate its remedial purposes." ORS 166.735(2). In that light, an intuitive question arises: why is the Secretary of State not just another victim of defendants' fraud? It therefore follows that the legislature would not have intended the Secretary of State's action in certifying the initiative petition signatures to cut off the chain of causation between defendants' false campaign financing reports and plaintiffs' alleged injury under the statute. In order to properly assess the merits of that argument, it is appropriate to consider plaintiffs' claim under ORICO in the context of the initiative process and the statutes that expressly apply to that process.

Article IV, section 1(2)(a), of the Oregon Constitution provides that "[t]he people reserve to themselves the initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independent of the Legislative Assembly." Section 1(4)(a) provides that "[t]he Legislative Assembly shall provide by law for the manner in which the Secretary of State shall determine whether [an initiative] petition contains the required number of signatures of qualified voters." Section 1(4)(b) provides that "[i]nitiative and referendum measures shall be submitted to the people as provided in this section and by law not inconsistent therewith." Pursuant to the authority granted by section 1(4)(a), the legislature has enacted ORS 250.045 to 250.135, which govern the Secretary of State's obligations regarding state measures, including the certification of signatures on initiative petitions, and ORS chapter 260, which governs the monitoring of campaign contributions and expenditures of political committees. Also, ORS 260.993 provides for criminal penalties, and ORS 260.995 provides for civil penalties, for violation of the provisions of the chapter, although the statutes presently providing for civil penalties were enacted when ORICO was enacted.

The remedy that plaintiffs seek to invoke under ORICO is solely statutory in nature, and the legislature has enacted other statutes that address plaintiffs' concerns but do not afford opponents of ballot measures a private remedy. Clearly, the legislature could have provided an express remedy through ORICO for defendants' election offenses, had it so intended, because it included other ORS chapter 260 offenses in its list of predicate offenses. Also, the legislature could have provided for plaintiffs to recover their expenditures in opposing a ballot measure as part of the sanctions available under ORS chapter 260. The legislature's silence in both regards persuasively suggests that we should not recognize the remedy that plaintiffs seek under ORICO by judicial interpretation. In effect, under Article IV and the applicable statutes, the Secretary of the State acts as a gatekeeper as to what measures are placed on the ballot. That function serves to validate for election purposes what measures are before the voters. In light of the fact that the legislature also charged the Elections Division of the Secretary of State with the monitoring of campaign reporting practices and with prosecuting violations for which there are available sanctions under other statutory schemes, it appears unlikely that the legislature would have contemplated that opponents of ballot measures could recover their expenditures as compensatory damages under ORICO on the grounds alleged by plaintiffs.

There are also additional reasons that lead to the above conclusion. First, I am unaware of any precedent that existed in 1981 that would have caused the legislature to think in conceptual terms that plaintiffs' expenditures to oppose defendants' ballot measures constituted "compensatory damages" within the ordinary meaning of those words, whether for ORICO purposes or for purposes of any other torts. Second, and perhaps most important, I have significant policy concerns about recognizing plaintiffs' theory of damages under ORICO. According to Article IV, section 1(2)(a), the people of Oregon have reserved to themselves the initiative power to propose laws and amendments to the constitution. It is a process whereby ordinary citizens can enact or repeal laws or create or modify provisions of the Oregon Constitution, and it is an integral part of the democratic process

along with the representative form of democracy that is exercised by the legislature. Moreover, the initiative process serves as an important part of the system of checks and balances that ensures that citizens in Oregon have a voice in how they are governed, what authority they vest in the branches of government authorized under the constitution, and what authority they retain to protect their personal interests and liberties.

If ORICO is construed to afford a remedy for opponents of initiative measures in the event of the kind of election law violations that plaintiffs allege, that remedy affects more than the pocketbooks of individual wrongdoers who commit ORICO violations; it will have a chilling effect on those innocent participants who contribute monies or who otherwise participate in promotion of ballot measures, whether it be in support of a ballot measure sponsored by defendants or by other political committees and individuals who wish to participate in the political process. For instance, in this case, the trial court awarded damages against defendants to plaintiff OEA in the amount of $2,014,974 and to plaintiff AFT in the amount of $510,000. When other potential participants or political committees view the result of this case, it is likely that they will be less willing to participate in the initiative process because of the exposure to liability under ORICO arising from the actions of an agent or representative. Again, in light of the fact that the legislature has enacted legislation that addresses election misconduct and targets wrongdoers with criminal and civil penalties to deter further conduct, it seems unlikely that the legislature would have contemplated providing an additional remedy through ORICO for opponents of initiative measures to recover their expenditures, given the chilling effect of civil damage awards on the initiative process itself. Rather, because the initiative process is a constitutionally guaranteed process, the legislature presumably would have intended to promote citizen involvement regarding the debate of political issues that arise through the initiative process rather than to provide a statutory remedy that inhibits participation in the process.

In summary, the issue before us is one of statutory interpretation of the phrase "by reason of" in ORS

166.725(7)(a). Our task is to discern the legislature's intent regarding that phrase. Because the text, context, and legislative history of the statute do not inform the issue sufficiently for us to declare the legislature's intent with any degree of certainty, we are required to determine what the 1981 legislature would have intended, had it considered the issue that is now before us. For the reasons discussed above, I believe that the legislature would not have intended to hold defendants liable for civil damages under the circumstances alleged by plaintiffs. I would hold, therefore, that plaintiffs failed to allege legally cognizable claims for damages under ORICO and that the trial court erred in denying defendants' ORCP 21 A motion to dismiss their complaints for compensatory damages.

## II.   THE GRANT OF INJUNCTIVE RELIEF

I turn now to the third and fourth assignments of error, which challenge the award of injunctive relief against defendants on behalf of intervenor, State of Oregon. The injunctions against defendants provide,

"4.   OTU-EF is hereby dissolved.

"5.   OTU-EF successor organizations are hereby enjoined from making any contributions or providing anything of value, including loans or in-kind contributions, to any political action committee and are so enjoined for a period of five years from the date the judgment is entered in this action. An 'OTU-EF successor organization' is defined as any educational foundation, or similar organization, that is eligible for I.R.C. § 501(c)(3) tax exempt status in which Bill Sizemore is a manager, officer, director, trustee, or controlling person of the successor organization or otherwise participates, directly or indirectly, in the direction or control of the activities of the OTU-EF successor organization.

"6.   OTU-PAC and its successor political action committees are hereby enjoined from receiving any contribution of anything of value from any I.R.C. § 501(c)(3) organization, including but not limited to OTU-EF or any OTU-EF successor organization, and are so enjoined for a period of five years from the date the judgment is entered in this action. An 'OTU-PAC successor political action committee' is defined as a political action committee in which Bill Sizemore is a director or treasurer or chief petitioner of

the successor political action committee, or otherwise participates, directly or indirectly, in the direction or control of the activities of the successor political action committee, and shall include but not be limited to the Committee to Restore Freedom in the Workplace, No More Political Fund-raising at Taxpayer Expense, Just Compensation for Regulatory Takings Committee, Committee to Preserve Self Government, Committee for Teacher Merit Pay, No New Taxes Without a Vote Committee, and Oregonians Against Double Taxation.

"7. OTU-PAC and OTU-EF and their successor organizations and successor political action committees which are jointly referred to herein as 'OTU successors' are hereby enjoined from transferring or destroying any of their assets, whether cash, personal property or real property, and including documents, computers, and computer hardware, software and files, and are so enjoined until the judgment entered in this action is fully satisfied or until further order of this Court.

"8. OTU-PAC and OTU-EF and their OTU successors are hereby enjoined from doing business with I&R Petitions Services, Inc. ('I&R'), and any and all I&R successors and are so enjoined for a period of five years from the date the judgment is entered in this action. An 'I&R successor' is defined as any corporation, sole proprietorship, partnership or other business which is owned in whole or in part by any owner of I&R, and performs similar services as I&R.

"9. OTU-PAC and its OTU successor political action committees are hereby enjoined from any violation of Oregon law in connection with their reporting on Contribution and Expenditure Reports ('C&E Reports') of any in-kind and direct contributions from OTU-EF or any other non-profit corporation, or other corporation, entity or person.

"10. OTU-EF and its successor organizations are hereby enjoined from any violation of Oregon law in connection with reporting on their CT-12 Reports and Form 990s.

"11. OTU-PAC and OTU-EF and their OTU successors are hereby enjoined from any violation of Oregon law in connection with the filing or submission of any statements of sponsorship for prospective petitions for a state measure.

"12.  OTU-PAC and OTU-EF and their successors are hereby enjoined from any violation of Oregon law in connection with the filing or submission of signature sheets on an initiative petition for a state measure.

"13.  OTU-PAC and OTU-EF and their OTU successors are hereby enjoined from any violation of Oregon law in connection with the filing or submission of CT-12 Reports, Form 990s and C&E Reports.

"14.  The injunctions set forth above in paragraphs 7 though 13 shall be effective April 30, 2003 and shall continue for five years from the date of this judgment."

In their third assignment of error, defendants argue that the trial court's injunction impermissibly restrains protected expression and political activities in violation of Article I, section 8, and Article IV, sections 1 and 2, of the Oregon Constitution. In their fourth assignment of error, defendants argue that the trial court erred in enjoining nonparties from participating in future political conduct activities protected by the Oregon Constitution.

The parties subject to the trial court's injunction are OTU-EF, its successor organizations, OTU-PAC, its successor organizations, and Bill Sizemore. Although Sizemore is permitted under the injunction to participate in political activities, the injunction significantly restricts his involvement in political committees that meet the injunction's definition of an OTU-EF and OTU-PAC successor political committee, including certain named political committees. Only OTU-EF and OTU-PAC are named defendants. Injunctive relief in this case was granted pursuant to ORS 166.725, which provides, in relevant part:

"(1)  Any circuit court may, after making due provision for the rights of innocent persons, enjoin violations of the provisions of ORS 166.720(1) to (4) by issuing appropriate orders and judgments[.]

"* * * * *

"(b)  Imposing reasonable restrictions upon the future activities or investments of any defendant, including, but not limited to, prohibiting any defendant from engaging in the same type of endeavor as the enterprise in which the

defendant was engaged in violation of the provisions of ORS 166.720(1) to (4)."

The above statutory language authorizes the grant of injunctive relief against only those persons who are "defendants."

The successor organizations and Bill Sizemore are not named defendants as ORS 166.725(1)(b) expressly requires. In response to defendants' arguments that the trial court was without authority to grant injunctive relief against unnamed parties, the state responds that ORCP 79 D embodies the common-law rule that an injunction binds not only the parties, but also those who are "successors in interest and Bill Sizemore, the man who exercised control over both entities." In support of its argument, the state relies on our decision in *Von Ohlen v. German Shorthaired Pointer Club*, 179 Or App 703, 710, 41 P3d 449, *rev den*, 334 Or 693 (2002). In *Von Ohlen*, the trial court issued a permanent injunction prohibiting the German Shorthaired Pointer Club of America from "collaring" dogs during field trials.[11] The injunction was based on the club's rules. Three years later, the German Shorthaired Pointer Club of America Foundation moved to dissolve the injunction because, as a successor organization, it had changed the rules to permit collaring. The threshold issue before us was whether the foundation was subject to the injunction. We concluded that its rights and interests were represented and adjudicated in the original injunction proceeding so as to be properly bound by it. We explained,

> "Although ORCP 79 D does not apply to permanent injunctions, such as the one here, we cite it for two reasons. First, as explained below, ORCP 79 D and its federal analogue reflect the common-law doctrine, which does apply. Second, we see no reason for applying a different rule to permanent injunctions."

179 Or App at 710 n 12.

This case presents a different issue from the issue that existed in *Von Ohlen*. The state does not seek injunctive relief for five years under the common law but rather based on the authority granted to the trial court under ORS

---

[11] "Collaring" within the context of *Von Ohlen* referred to the controlling of a dog during field trials by the collar around its neck rather than by voice command.

166.725(1)(b). Consequently, the issue is one of statutory interpretation: Did the legislature intend to grant authority under ORICO to enjoin those nonparties who are identified with the named defendants or who may be in privity with them as successors in interest? The usual rules of statutory construction apply, and we are therefore charged with ascertaining the legislature's intention by first examining the text and the context of the statute itself. As pointed out above, the text of the statute does not refer to successors in interest or those who control entities that are named defendants; it refers only to "any defendant." Moreover, ORS 166.715(2) and (5) expressly define who is subject to the provisions of the statute in terms of "person[s]" and "enterprise[s]."[12] Significantly, none of those definitions encompasses "successors in interest" or persons in control of an enterprise. Clearly, Bill Sizemore is a "person" within the meaning of ORICO and could have been included as a named defendant.

Finally, ORCP 79 D is not proper context for ORS 166.725(1)(b) because it refers only to "preliminary injunctions" and "restraining orders."[13] If we were to hold that the statute authorizes injunctive relief to any defendant, their successors in interest, and to any person identified with them, we would be adding words to the statute that do not appear, in contravention of ORS 174.010. Accordingly, I would hold that in issuing judgments against nonparties, the trial court exceeded its statutory authority under ORS 166.725(1)(b).[14]

---

[12] For purposes of ORICO, an "enterprise" includes "any individual, sole proprietorship, partnership, corporation, business trust or other profit or nonprofit legal entity, and includes any union, association or group of individuals associated in fact although not a legal entity, and both illicit and licit enterprises and governmental and nongovernmental entities." ORS 166.715(2). A "person" within the meaning of ORICO is "any individual or entity capable of holding a legal or beneficial interest in real or personal property." ORS 166.715(5).

[13] ORCP 79 D provides:

"Every order granting a preliminary injunction and every restraining order shall set forth the reasons for its issuance, shall be specific in terms, shall describe in reasonable detail (and not by reference to the complaint or other document) the act or acts sought to be restrained, and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise."

[14] I do not reach my conclusion based on anything other than the language of the statute itself. *But see, e.g., Polygon Northwest v. NSP Development, Inc.,* 194 Or

Moreover, the trial court's judgment in paragraph 4 dissolves OTU-EF. As the majority points out, defendants do not assign that provision of the judgment as error, and, therefore, for purposes of appeal, it constitutes a final judgment. Because, under the judgment, OTU-EF is adjudicated to no longer exist as a legal entity, it cannot be a "defendant" subject to future injunctive relief under ORS 166.725(1)(b) and any injunction pertaining to it should be vacated for that reason. The result of the analysis in this paragraph and the preceding one leaves only defendant OTU-PAC as the remaining defendant against whom the trial court was authorized to grant injunctive relief.

The trial court found that OTU-PAC, through its agents, knowingly submitted false signature sheets for Measure 98, acts that constituted the crimes of forgery under ORS 165.007 and ORS 165.013, and unsworn falsification under ORS 162.085. It also found that OTU-PAC through its agents knowingly submitted false statements of sponsorship for Measures 92 and 98, acts that constituted forgery under ORS 165.007 and ORS 165.013, and unsworn falsification under ORS 162.085. The trial court also concluded that OTU-PAC's activities constituted racketeering activity under ORS 166.715(6)(B) and a pattern of racketeering within the meaning of ORS 166.715(4). I agree with those findings and conclusions. Because OTU-PAC violated the provisions of ORS 166.720(1) to (4), it follows that intervenor is entitled to injunctive relief under ORS 166.725 unless OTU-PAC is entitled to prevail on its argument that the injunction against it is unconstitutional.

OTU-PAC first argues that its political contributions and expenditures qualify as constitutionally protected activities within the meaning of Article I, section 8, of the Oregon Constitution and, therefore, the injunction prohibiting it from engaging in those activities is unlawful.[15] The state

App 661, 96 P3d 837 (2004) (holding that the general rule is that a nonparty to an injunction proceeding who has notice or knowledge of its terms is bound thereby and subject to contempt sanctions for violating its provisions). Here, however, the issue is not whether the unnamed defendants can be subsequently held in contempt for disobeying the terms of a prior injunction but whether the trial court had statutory authority to enter judgment against any artificial or natural person who was not named as a party defendant.

[15] Article I, section 8, provides that "[n]o law shall be passed restraining free expression of opinions, or restricting the right to speak, write, or print freely on any subject whatever, but every person shall be responsible for the abuse of this right."

acknowledges that, in the abstract, contributions to political committees by citizens and expenditures by political committees on behalf of citizens advocating a particular political position constitute protected expression under Article I, section 8. *Vannatta v. Keisling*, 324 Or 514, 520-24, 931 P2d 770 (1997). I understand OTU-PAC not to challenge the constitutionality of ORS 166.725(1) directly but rather to make an "as applied" challenge to the injunctive relief issued against them that is based on the authority of ORS 166.725(1). Under *State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982), the first inquiry is whether the injunction on its face is

> "directed to the substance of any 'opinion' or any 'subject' of communication unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach."

Here, the injunction, on its face, prohibits OTU-PAC from making or receiving any political contributions. It is clear that the injunction, on its face, targets protected political expression. *See Vannatta*, 324 Or at 538 (holding ballot measure providing for limits on contributions to state political campaigns unconstitutional in part under Article I, section 8).

It follows that the injunction is constitutionally infirm unless it fits within a historical exception or unless the actual focus of the injunction is on an effect of a proscribed harm rather than on the substance of the communication itself. *State v. Stoneman,* 323 Or 536, 543, 920 P2d 535 (1996). "Historical exceptions" include "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants." *Robertson,* 293 Or at 412. However, the injunction in this case is much broader than any of the above exceptions, operating to enjoin OTU-PAC from any political activity as well as the violation of any campaign law.[16]

Nonetheless, if the actual focus of the injunction is on a proscribed harm rather than on the substance of the

---

[16] In *Vannatta*, the court said, "The earliest indication that we have found of Oregon's distrust of the role that money plays in the political process is the 1909 'Corrupt Practice Act Governing Elections.' " 324 Or at 538 n 23.

communication itself, the injunction can survive scrutiny under Article I, section 8. Thus, the question becomes whether ORS 166.725(1)(b), as applied through the trial court's grant of injunctive relief, is constitutionally overbroad. *Stoneman*, 323 Or at 543. Here, the harm that the injunction focuses on is the violation of election laws, rather than the content of the political expression by OTU-PAC. As the state argues, "[g]iven the long history of multiple violations of the law, it was proper for the trial court to assume that the violations would resume in the absence of a suitable injunction, and to order remedial relief accordingly." I would therefore reject OTU-PAC's challenge under Article I, section 8, in light of the focus of the injunction on harmful effects.

OTU-PAC also argues that the injunction violates Article IV, sections 1 and 2, of the Oregon Constitution, which reserve to citizens the legislative power of the initiative, including the ability to solicit signatures for initiative sponsorship and petitions. In its view, "the injunction purports to disable OTU and others from doing that which Article IV separately preserves." The state responds, "Nothing prohibits the defendants or any individual associated with the defendants from gathering signatures or using some legitimate business to assist in so doing." The state is correct as to the provisions contained in paragraphs 9 to 13 of the injunction. However, the remaining paragraphs of the injunction enjoin OTU-PAC from making or receiving political contributions for the initiative process. The next question, however, is whether OTU-PAC, a political action committee, can assert any rights under Article IV.

As stated above, Article IV, sections 1(1) and 1(2)(a) reserve the initiative power to the "people." In determining the meaning of a provision of the constitution, we are to examine its text, the historical circumstances that led to its adoption, and any case law construing it. *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). We assume that the framers of a provision and the people who caused it to become part of our constitution intended ordinary meanings for the words in the provision. *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 560, 871 P2d 106 (1994).

The word "people" in the context used in Article IV refers to the people of Oregon. In that context, the word "people" refers to "human beings making up a group or assembly" such as "the members of a geographically distinct community." *Webster's* at 1673.[17] In contrast, political committees like OTU-PAC are defined by statute. ORS 260.005(16)(a) defines a "political committee" as a combination of two or more individuals or a person other than an individual that has received a contribution for the purpose of supporting or opposing a candidate, measure, or political party or who makes an expenditure for the purpose of supporting or opposing a candidate, measure, or political party. By definition, a political committee is not an "individual" and therefore cannot be for purposes of Article IV, part of the "people" of the State of Oregon. Consequently, OTU-PAC cannot assert any rights under Article IV.

## III. SUMMARY

In summary, I would vacate the award of money damages to plaintiffs because there is no indication that the legislature intended that a remedy under ORICO is available to them. I would also dismiss the injunctions against all entities and persons who were not named as defendants. Finally, I would affirm the injunctive relief awarded by the trial court against OTU-PAC. For these reasons, I concur in part with the majority opinion and otherwise dissent.

---

[17] That definition conforms with definitions in dictionaries used in the promulgation of the Oregon Constitution and in existence during the enactment of Article IV, section 1. *See, e.g.*, Noah Webster, *An American Dictionary of the English Language* (1828) (defining "people" as "1. The body of persons who compose a community, town, city or nation"); Francis Rawle, *Bouvier's Law Dictionary* 649 (1897) ("When the term *the people* is made use of in constitutional law or discussions, it is often the case that those only are intended who have a share in the government through being clothed in the elective franchise.").

# APPENDIX "A"

ER–6

"17. What is the amount of damages you award to plaintiff AFT?

"$170,000.

"Dated this 27th day of September, 2002.

" /s/
"Presiding Juror"

On December 20, 2002 the court granted the motion of the State of Oregon to intervene.

On February 3, 2003 this matter came on for a bench trial on the requests of plaintiffs and intervenor for equitable relief, the court having before it the evidence received at the prior jury trial. Plaintiff OEA was represented by Gregory A. Hartman and Bennett, Hartman, Morris & Kaplan, LLP and Mark S. Toledo. Plaintiff AFT was represented by Gene Mechanic and Goldberg, Mechanic, Stuart & Gibson LLP. Intervenor-plaintiff State of Oregon was represented by Assistant Attorney General Christine B. Miller. Defendants OTU-PAC and OTU-EF were represented by Gregory W. Byrne.

On April 30, 2003 the court entered its Findings of Fact and Conclusions of Law and Introduction Thereto, which are incorporated herein by reference, and entered its Injunction Order.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. Plaintiff OEA have judgment against defendants OTU and OTU-EF, jointly and severally, for $671,658, to be trebled pursuant to ORS 166.725(7)(a), for a total of $2,014,974;

2. Plaintiff AFT have judgment against defendants OTU and OTU-EF, jointly and severally, for $170,000, to be trebled pursuant to ORS 166.725(7)(a), for a total of $510,000;

3. All claims against John Does be dismissed without prejudice;

4. OTU-EF is hereby dissolved.

Page 5 - MONEY JUDGMENT AND EQUITABLE DECREE

G:\OEA\OEA Main 48134\15-1019 OEA v OTU\Judgment.wpd

5. OTU-EF successor organizations are hereby enjoined from making any contributions or providing anything of value, including loans or in-kind contributions, to any political action committee and are so enjoined for a period of five years from the date the judgment is entered in this action. An "OTU-EF successor organization" is defined as any educational foundation, or similar organization, that is eligible for I.R.C. § 501(c)(3) tax exempt status in which Bill Sizemore is a manager, officer, director, trustee, or controlling person of the successor organization or otherwise participates, directly or indirectly, in the direction or control of the activities of the OTU-EF successor organization.

6. OTU-PAC and its successor political action committees are hereby enjoined from receiving any contribution of anything of value from any I.R.C. § 501(c)(3) organization, including but not limited to OTU-EF or any OTU-EF successor organization, and are so enjoined for a period of five years from the date the judgment is entered in this action. An "OTU-PAC successor political action committee" is defined as a political action committee in which Bill Sizemore is a director or treasurer or chief petitioner of the successor political action committee, or otherwise participates, directly or indirectly, in the direction or control of the activities of the successor political action committee, and shall include but not be limited to the Committee to Restore Freedom in the Workplace, No More Political Fund-raising at Taxpayer Expense, Just Compensation for Regulatory Takings Committee, Committee to Preserve Self Government, Committee for Teacher Merit Pay, No New Taxes Without a Vote Committee, and Oregonians Against Double Taxation.

7. OTU-PAC and OTU-EF and their successor organizations and successor political action committees which are jointly referred to herein as "OTU successors" are hereby enjoined from transferring or destroying any of their assets, whether cash, personal property or real property, and including documents, computers, and computer hardware, software and files, and are so enjoined until the judgment entered in this action is fully satisfied or until further order of this Court.

Page 6 - MONEY JUDGMENT AND EQUITABLE DECREE

ER–8

8. OTU-PAC and OTU-EF and their OTU successors are hereby enjoined from doing business with I&R Petitions Services, Inc. ("I&R"), and any and all I&R successors and are so enjoined for a period of five years from the date the judgment is entered in this action. An "I&R successor" is defined as any corporation, sole proprietorship, partnership or other business which is owned in whole or in part by any owner of I&R, and performs similar services as I&R.

9. OTU-PAC and its OTU successor political action committees are hereby enjoined from any violation of Oregon law in connection with their reporting on Contribution and Expenditure Reports ("C&E Reports") of any in-kind and direct contributions from OTU-EF or any other non-profit corporation, or other corporation, entity or person.

10. OTU-EF and its successor organizations are hereby enjoined from any violation of Oregon law in connection with reporting on their CT-12 Reports and Form 990s.

11. OTU-PAC and OTU-EF and their OTU successors are hereby enjoined from any violation of Oregon law in connection with the filing or submission of any statements of sponsorship for prospective petitions for a state measure.

12. OTU-PAC and OTU-EF and their successors are hereby enjoined from any violation of Oregon law in connection with the filing or submission of signature sheets on an initiative petition for a state measure.

13. OTU-PAC and OTU-EF and their OTU successors are hereby enjoined from any violation of Oregon law in connection with the filing or submission of CT-12 Reports, Form 990s and C&E Reports.

14. The injunctions set forth above in paragraphs 7 through 13 shall be effective April 30, 2003 and shall continue for five years from the date of this judgment.

15. That plaintiffs are entitled to costs and attorney fees to be determined pursuant to ORCP 68.

///

Page 7 - MONEY JUDGMENT AND EQUITABLE DECREE

G:\OEA\OEA Main 4813\4415-1019 OEA v OTU\Judgment.wpd